# EXHIBIT A

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
DOMESTIC VIOLENCE UNIT

- - - - - - - - - - - - - - - x
ROBYN KASS-GERJI,                : Docket Number:  2024 ASO 000437
                                 :
          Petitioner,            :
                                 :
                                 :
          vs.                    :
                                 :
                                 :
VICTORIA VESPICO,                :
                                 :
          Respondent.            : Wednesday, May 29, 2024
- - - - - - - - - - - - - - - x Washington, D.C.


        The above-entitled action came on for an ASO

hearing before the HONORABLE JOHN MCCABE, Associate Judge,

in Courtroom Number 113.


                APPEARANCES:


                On Behalf of the Petitioner:

                HANNAH FRIEDMAN, Esquire
                Washington, D.C.


                On Behalf of the Respondent:

                WILLIAM ABRAHAM, Esquire
                Washington, D.C.


                                                25-01642



1

T A B L E   O F   C O N T E N T S

WITNESSES

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| On behalf of the Petitioner: |  |  |  |  |
| Robyn Kass-Gerji |  |  |  |  |
| by Ms. Friedman | 14,45 |  | 110 |  |
| by Mr. Abraham |  | 91 |  |  |
| On behalf of the Respondent: |  |  |  |  |
| Victoria Vespico |  |  |  |  |
| by Mr. Abraham | 114 |  |  |  |
| by Ms. Friedman |  | 123 |  |  |
| Dawn Cinti |  |  |  |  |
| by Mr. Abraham | 128 |  |  |  |
| by Ms. Friedman |  | 132 |  |  |
| Charlies Kasko |  |  |  |  |
| by Mr. Abraham | 142 |  |  |  |
| by Ms. Friedman |  | 147 |  |  |

E X H I B I T S

| NUMBER | DESCRIPTION | ID'D | REC'D |
|---|---|---|---|
| On behalf of the Petitioner |  |  |  |
| 1 - March 10, 2024 text messages |  |  | 25 |
| 2 - March 11, 2024 text messages |  |  | 35 |


www.escribers.net | 800-257-0885

2

3 - March 12, 2024 text messages                           37

4 - March 23, 2024 texts messages                          42

5 - April 1, 2024 text messages                            48

9 - TikTok video                                           53

6 - April 3, 2024 text messages                            55

7 - April 4, 2024 text messages                            63

8 - April 9, 2024 texts                                    68

10 - Text messages dated 4/14/24                           71

11 - Text messages dated 4/15/24                           74

12 - Text messages dated 4/25/24                           78

13 - Text messages dated 5/1/24                            81

14 - Text messages dated 5/8/24                            86

16 - Text messages dated 5/10/24                           88

M I S C E L L A N Y

OPENING STATEMENT BY PETITIONER                            10

OPENING STATEMENT BY PLAINTIFF                            111



P R O C E E D I N G S

THE DEPUTY CLERK:  Your Honor, we're calling to the record case number 2024 ASO 437, in the matter of Robyn Kass-Gerji versus Victoria Vespico.

Ms. Kass-Gerji, can you please state your name for the record?

THE COURT:  Is Robyn Kass-Gerji -- go ahead, ma'am.  Just unmute yourself and state your name.  I think you might still be muted.  Go ahead.

MS. KASS-GERJI:  Sorry.  Robyn Kass-Gerji.

THE COURT:  Kass-Gerji?  All right.

And Ms. Friedman?

MS. FRIEDMAN:  Good morning -- good afternoon, Your Honor.  Hannah Friedman with Network for Victim Recovery of D.C. on behalf of the petitioner, Robyn Kass-Gerji.

THE COURT:  All right.  And Ms. -- is it Vespico?  Go ahead.

MS. VESPICO:  Yes, Your Honor.  Victoria Vespico.

THE COURT:  All right.  And Mr. Abraham?

MR. ABRAHAM:  Yes.  Your Honor.  Good morning -- good afternoon.

THE COURT:  All right.  Good afternoon, everyone.  I'm actually glad I only kept you waiting till

and that she is not above the law. But more importantly, granting this anti-stalking order will give Ms. Kass-Gerji the peace of mind of knowing that respondent will never again threaten the safety of Ms. Kass-Gerji or her family. Thank you.

THE COURT: All right. Thank you, Ms. Friedman.

Mr. Abraham, you're welcome to make an opening statement now or reserve, whatever you prefer.

MR. ABRAHAM: Your Honor, I'll reserve mine until the petitioner has presented her case-in-chief.

THE COURT: All right. So Ms. Friedman, if you want to call your witness.

MS. FRIEDMAN: Yes, Your Honor. I'd like to call to the stand Robyn Kass-Gerji, the petitioner in this case.

THE COURT: Ms. Kass-Gerji, if you could just raise your right hand, Ms. Robinson will give you the oath.

Thereupon,

**ROBYN KASS-GERJI,**

having been called as a witness for and on behalf of the Petitioner, and having been first duly sworn by the Deputy Clerk, was examined and testified as follows:

THE DEPUTY CLERK: Thank you.

**DIRECT EXAMINATION**

BY MS. FRIEDMAN:

Q Okay. Ms. Kass-Gerji, can you please state and spell your name for the record?

A Robyn Kass-Gerji, R-O-B-Y-N K-A-S-S-G-E-R-J-I.

Q And is your address confidential?

A Yes.

Q Without giving me your address, where do you live?

A I split my time between Washington, D.C. and Pennsylvania.

Q And do you maintain a residence in Washington, D.C.?

A I do.

Q You rent or own a place in D.C.?

A Yes.

Q Okay. And these incidents alleged in your petition, did any of them occur in Washington, D.C.?

A Yes.

Q Okay. How did you meet the respondent in this case, Victoria Vespico?

A Through the Miss Pennsylvania Scholarship organization. We competed together for the first time about four and a half, five years ago, give or take.

Q Okay. And can you explain what the Miss Pennsylvania scholarship organization is?



A    It's a subsidiary -- subsidiary of the Miss America program, which is the largest scholarship organization for young women across the country.  So basically, anyone competing does compete on stage as well as in a ten-minute interview vying for scholarships that could go upwards of $50,000.

Q    Okay.  And have you ever earned one of those scholarships?

A    Yes.

THE COURT:  Can I just ask -- sorry to interrupt, Ms. Friedman.  Is your name, does it have a hyphen in it, your last name?

THE WITNESS:  Yes, it does.

THE COURT:  So K-A-S-S-G-E-R-J-I?

THE WITNESS:  Yes, sorry.

THE COURT:  Okay.  All right.  And the G is not capitalized?

THE WITNESS:  No, it doesn't need to be.

THE COURT:  Okay.  All right.  Go ahead, Ms. Friedman.

MS. FRIEDMAN:  Thank you.

BY MS. FRIEDMAN:

Q    And Ms. Kass-Gerji, what were you able to do with those scholarships that you said you won?

A    I was able to get two bachelor's degrees and two

graduate degrees.  And planning on hopefully using future scholarships for law school and or a doctorate.

Q   Okay.  And approximately -- oh, excuse me.  You already testified to that.  And so how would you have described your relationship with respondent around the time when you first met?

A   I would say we were friendly when we first met.

Q   And is that how you would describe your relationship with respondent now?

A   No.

Q   Around when did your relationship with respondent change?

A   It had been in and out of, you know, since meeting, friendly, not friendly, friendly, not friendly. It's only gotten really bad over the past couple of years.

Q   Okay.  And what, if anything, caused that change in your relationship?

A   I genuinely don't know.

Q   Okay.  And how would you describe your relationship with respondent now?

A   Nonexistent.  But the contact that there is, is hostile.

MS. FRIEDMAN:  Court's brief indulgence.

BY MS. FRIEDMAN:

Q   You said you received -- or your contacts now

are hostile.  When around would you say the contacts first became hostile?

A    The bullying began, I would say, about a year and a half to two years ago, maybe a little bit before that.  But the death threats didn't start until March, April of this year.

Q    And how would you have described the bullying that you said you received two and a half plus years ago?  How would you describe that?

A    I would just -- I would probably call it just like, cattiness.  I mean, I was getting called fat, dumb.  I personally heard her say things when she thought I wasn't in the room about me.  You know, type of just bullying that you see within young women sometimes.

Q    And how, if at all, did you respond to respondent's conduct when it first began?

A    I tried to ignore it.

Q    And what, if any reason, would you have to be in the same vicinity as respondent in the near future?

A    I work throughout the State of Pennsylvania, as well as Maryland, D.C., and new Jersey, and I travel extensively throughout the State of Pennsylvania, working with organizations such as Geisinger Health, Wilkes University, a bunch of schools and programs in her area, as well as nonprofits, as well as the Ms. Pennsylvania

competition.

Q   You're both competing in the Ms. Pennsylvania competition?

A   Yes.

Q   And when is that competition?

A   We have to be there June 9th.  The actual competition itself is the 13th, 14th and 15th.

Q   And approximately how many women are competing for Ms. Pennsylvania this year?

A   25, I believe.

Q   Okay.  And why are you seeking this order now, when you say you've been receiving bullying messages for years?

A   Because before I wasn't necessarily scared that she was going to hurt me or my loved ones.  It wasn't until the death threats started coming in until -- that it got really bad.  I had reported the bullying to the organization a few times, and unfortunately no one was able to help.  And I decided once that I started to fear for myself as well as my loved ones, that I should make a police report and follow through the legal channels.

Q   And in your petition under incident A, you wrote that on March 10th, 2024, you received text messages from an unknown number threatening to punch you, correct?

A   Yes.



MS. FRIEDMAN:  If it's all right with the Court, I'd like to try sharing the exhibits myself.

THE COURT:  All right.

MS. FRIEDMAN:  Do I have the --

THE COURT:  That's fine.

MS. FRIEDMAN:  I think I do have the text permission.  Okay.

THE COURT:  When you get it on the screen, I'll just try to confirm that others are able to see it.

MR. ABRAHAM:  Your Honor, may I ask plaintiff's counsel if this is one of the uploaded exhibits?  Yes? Okay.  Which exhibit number?

MS. FRIEDMAN:  Yes.  I will be pulling up Exhibit 1, but I'm just showing that I'm in the Court box right now, I believe.  Sorry.  Now, I can't see you guys.

THE COURT:  It looks like Exhibit 1 is the first one --

MS. FRIEDMAN:  Yes.

THE COURT:  -- in order, which is a pleasant surprise.  One of the challenges we often have with the remote exhibits is a lot of times they're not numbered. And so it's a wonderful thing for the judge is when there's attorneys who can put them in order.  So this will be marked as Exhibit 1 for the Court, holding off on whether to admit it into evidence.



But you can ask whatever -- are you at least able to see it, Mr. Abraham?

MR. ABRAHAM:  Yes, Your Honor, I have it.  Thank you.

THE COURT:  You can proceed, Ms. Friedman.

MS. FRIEDMAN:  Thank you.  Okay.  Your Honor, I have what has been pre-marked as petitioner's Exhibit 1 for identification purposes.  I previously submitted this exhibit to respondent via Box.com.

BY MS. FRIEDMAN:

Q    Ms. Kass-Gerji, are these the text messages that you were referencing in your petition when you wrote about the text you received on March 10th?

A    Yes.

Q    And who took these screenshots?

A    I did.

MR. ABRAHAM:  Your Honor, I'm going to object at this point to Exhibit 1.  I think in its entirety there's several pages.  I mean, I know plaintiff's counsel just asked the witness whether or not these were -- she believes they were received on, I think she said, March the 10th.  But best evidence rule is that text messages themselves, I would suggest to the Court.  And Exhibit 1 displays no date.  These could have been sent anytime, if they were sent at all.



So without an actual date on the text message to determine at least to some degree, convincingly to the Court as to when they were actually sent, I'm objecting to their introduction.

THE COURT:  All right.  Ms. Friedman, you can respond.  It's been my experience, but I don't -- I'm not at all an expert on tech issues that when people take screenshots, it doesn't necessarily show the date something was received.  But I understand what Mr. Abraham's point is.  So what is your response, Ms. Friedman?

MS. FRIEDMAN:  Your Honor, if I could, I'd like to continue laying a foundation, and perhaps that may answer opposing counsel's questions.  And if not --

THE COURT:  All right.  Go ahead and you can continue to lay a foundation and I'll get back to your objection, Mr. Abraham.

MS. FRIEDMAN:  Thank you.

BY MS. FRIEDMAN:

Q    Ms. Kass-Gerji, how do you know you received these texts on or about March 10th, 2024?

A    Because March 9th is when I competed at the Miss York and Miss Susquehanna Valley competition, and we drove directly back to D.C. after.  And it was the next day that I received these messages.  And I know that from, you



know, it's in all in my calendar and I could --

Q    Okay.  And for the record, what time did you receive these text messages on or about March 10, 2024?

A    3:05 p.m.

Q    Okay.  And do you still have these texts in your phone?

A    I do not have the specific texts, unfortunately, because they are text message and not iMessage, they could not be restored from the cloud.

Q    And why were they -- why would they need to be need to be restored?

A    Because I blocked the number and tried to delete everything and forget about it at that time.

Q    And the text in gray, are those text messages that you sent or received?

A    Received.

Q    Okay.  And the text in green, did you send or receive that?

A    I sent those.

Q    Okay.  And where were you when you received these messages?

A    In my home in D.C.

Q    Are these screenshots a fair and accurate representation of the text you received from an unknown number on March 10, 2024?

A    Yes.

MS. FRIEDMAN:  Your Honor, I would move to admit these texts as Petitioner's Exhibit 1.

THE COURT:  All right.  Mr. Abraham, anything further you wanted to state to the -- in terms of an objection?

MR. ABRAHAM:  Yes, Your Honor.  Again, the text doesn't reference the specific date.  More importantly, perhaps, Your Honor, is no foundation has been laid whatsoever that the telephone number that appears at the top of the screen, or that text message string  8726, whose telephone number that is.

THE COURT:  All right.  I'll admit Exhibit 1 over objection.  I mean, with regard to the phone number, obviously, that may not carry much weight unless there's a connection, as Mr. Abraham was saying, from the phone number that's shown at the top, which even my limited understanding of technology, that means the phone number that sent the -- that was communicating with the phone. But that's up to Ms. Friedman to see if there's any much relevance to it.

In terms of the other, I think, certainly, a good point to be raised about the fact that the dates are dates are not shown on it and that a date would likely be shown on the actual phone itself.  But I'm still going to

admit it.  Obviously, Ms. Kass-Gerji has testified that she received it on that particular date.  Like anything else, her credibility on that can be challenged.  But I will admit Exhibit 1, as clearly a foundation has been laid that these are, as the attorneys know, the evidence rules haven't properly fully caught up with the way we communicate now.  But certainly I accept that the foundation has been laid that on Ms. Kass-Gerji's cell phone that she possessed, that those words appeared on her cell phone and she simply copied it.

So with that, you can proceed, Mr. Friedman.  Exhibit 1 will be admitted.

(Petitioner's Exhibit Number 1 was received into evidence.)

MS. FRIEDMAN:  Thank you, Your Honor.

BY MS. FRIEDMAN:

Q    Ms. Kass-Gerji, the sender of these texts wrote, quote, "Why the fuck did you come back to Pennsylvania?  We don't fucking want you here", end quote.  Had you come back to Pennsylvania recently?

A    Yes.  I moved back within the last year.

Q    Okay.  And the sender of these texts also wrote that, quote, "You got stupid Susquehanna Valley".  Can you explain what you understand the sender to mean?

A    So the organization that held the competition --

MR. ABRAHAM:  I'm going to object, Your Honor, to the question, as asked.  I mean, it calls for speculation, for her witness to know what the sender was thinking at the time this was sent.  That's impossible.  She can't possibly know what that person was thinking.  I mean, circumstantially, there may be something there, but I would object to the question as stated.

THE COURT:  Could you just repeat the question, Ms. Friedman?  I'm sorry, I don't think I caught it.

MS. FRIEDMAN:  My question as stated was, the sender of these texts wrote, quote, "You got stupid Susquehanna Valley".  Can you explain what you understood the sender to mean by that?  But I can rephrase it.

THE COURT:  Yeah.  Why don't you just rephrase the question?

MS. FRIEDMAN:  Sure.

BY MS. FRIEDMAN:

Q    What is, quote, "Stupid Susquehanna Valley", end quote, referring to in these messages?

A    So the organization that held the competition is the York County organization.  And they crowned three titles, Ms. York being the highest title, Susquehanna Valley being the second highest, and White Rose city being the third highest.

Q    Okay.  And is that the title that you had won on

March 9th?

A    Yes.

Q    Okay.  And was your win public information?

A    Yes.

Q    Okay.  And you testified earlier that you live in D.C.  Why would you choose to compete for Miss Pennsylvania rather than -- or compete at all in Pennsylvania competitions, rather than in D.C. competitions?

MR. ABRAHAM:  Your Honor, I'm going to object here, if I may, on relevance.  I'm not sure what the relevance of this line of questioning is getting into as to why she competed in Pennsylvania.  I'll stipulate that and take Ms. Kass-Gerji at her word that clearly there was a past relationship, whether it was friendly or unfriendly at different times between both the petitioner and the respondent, and that they had competed in pageants together in the past.  But I'm not sure how that's relevant necessarily to the alleged threats that are being put forth before the Court today.

THE COURT:  All right.  The objection is overruled.  I'll allow some background information about the participation by Ms. Kass-Gerji in particular contests.  So you can just repeat your question.

BY MS. FRIEDMAN:



Q    Ms. Kass-Gerji, why did you choose to compete in Pennsylvania competitions rather than in, say, D.C. competitions?

A    I'm originally from Pennsylvania. I have a residence in both states. I work in both states, and Pennsylvania offers higher amounts of scholarships and more scholarships. And I was hoping that if I could win some of those, I could use them for, you know, to further my education.

Q    Okay. And can you compete again next year if you don't win? I'm sorry. You might be frozen. Okay. I just didn't hear your answer. Can you compete again next year?

A    No. No, I can't.

Q    Okay. To your knowledge, can Ms. Vespico compete again next year if she doesn't win this year?

A    Yes.

Q    Okay. You testified earlier that you sent the message seen here in green. Why did you send a response?

A    Because I wanted to let whoever was sending the messages know that I wasn't going to let it get to me, and that I was still going to go through with it and fight for myself, as well as anyone else who was receiving messages like this.

Q    And when you say going through with it, what do



you mean?

A    Going through with competing and being part of the program.

Q    Can you please read the part of your response in green labeled number five here, and let me know if you need me to zoom in?

A    "And yes, I do know who you are.  And this has been going on for years now.  And again, I still don't know why.  I am sorry if I have ever done anything to hurt or upset you.  If you would like to talk about it like adults, you have my number, and I'm here when you're ready.  I will see you soon and I look forward to competing alongside you."

Q    When you wrote, "Yes, I do know who you are", who did you believe sent these messages?

A    Ms. Vespico.

Q    Okay.  And why did you believe it was Ms. Vespico?

A    I had received similar messages from other anonymous numbers that were able to be traced back to her email in the past.

Q    And how were you able to trace them back to her email?

A    At the time, it was a public IP address, and you could call the text app company and ask, you know, who was

connected to this?

Q And why did you offer to talk with the sender of these text messages?

A Because I would have rather done this amicably and just discussed what the issue was, rather than going through all of this that we are at now.

Q Scrolling to the bottom, the sender of these texts wrote, "Don't expect me to be nice to you or anything. I've made you cry before and I'll do it again if I have to". When, if ever, has the respondent made you cry?

A The -- I believe, the specific time this is referencing is at my second year competing in Pennsylvania where she said some very rude things to me, and I walked away crying and then sat in the lobby for about 20 minutes crying until I could pull myself together.

Q And do you remember what kind of rude things Ms. Vespico said to you?

A Just that I didn't belong there, and I wasn't going to make the semifinals if I -- if I wasn't people's choice because I didn't deserve to be there.

MS. FRIEDMAN: Okay.

Court's brief indulgence.

BY MS. FRIEDMAN:

Q And what efforts, if any, were made following

this incident to stop this conduct from repeating?

A    There was actually a phone call between myself, Don Senti (phonetic), Charles Casko (phonetic), as well as Victoria, where we tried to have a four-way mediation.

Q    Okay.  And do you remember what date that conversation took place?

A    Yeah, it was the next ninth -- next night, I believe, which was March 11th.

Q    Okay.  And this happened in person, over the phone, video phone?

A    Over the phone.

Q    Okay.  And did you feel that that conversation resolved the issue?

A    No, I felt like I was coerced and forced into saying that I believed Victoria didn't do it and that I -- they had actually said that, you know, coming forward about this only gives whoever sent these messages more power and that I should not have come forward.

Q    Okay.  And what, if any, evidence had you given Don and Charlie at that point prior to this phone conversation?

A    They had only seen these specific text messages.

Q    The ones that we're looking at right now, Exhibit 1?

A    Yes.

Q   Okay.  Okay.  And what, if anything, about Don or Charlie's reactions surprised you?

A   I was shocked that they thought that I was lying about this or that.  You know, it was people who previously had supported me and my endeavors to advocate for other survivors of abuse and assault, and you know, any type of harassment that they would tell me not to come forward and not to advocate for myself.

Q   And is there anything in the way you have interacted with Don or Charlie in competitions in the past that caused you to be surprised by their --

THE COURT:  Ms. Friedman, can we just move on to something else?  I'm not sure the reaction of people named Don and Charlie, whom I don't even know who they are, why that matters in this case.

MS. FRIEDMAN:  Sure.  Your Honor, I've been informed they will be testifying.  And so that's why I'm having her speak to -- to that instance.  But I can move on.

THE COURT:  Yeah, move on.

BY MS. FRIEDMAN:

Q   Ms. Kass-Gerji, in your petition under incident B, you wrote that on March 11th, 2024, you received unwanted text messages from respondent, correct?

A   Correct.

Q    Are these those text messages?

A    Yes.

MS. FRIEDMAN:  Your Honor, I have what has been pre-marked as Petitioner's Exhibit 2 for identification purposes.  Previously submitted this submitted this exhibit to respondent via Box.com.

BY MS. FRIEDMAN:

Q    Ms. Kass-Gerji, who took this screenshot?

A    I did.

Q    And why did you take the screenshot?

A    Because this was the first time something had come from her personally that wasn't an anonymous text number.

MR. ABRAHAM:  Your Honor, I'm going to object at this point.  Again, similar objections to Exhibit 1 that was admitted into evidence.  There's no telephone number associated with this on this exhibit.  And there are -- I don't see any kind of date anywhere as to when this may have been received by the petitioner.

THE COURT:  All right.  I don't think it's been offered in evidence yet.  Were you offering Exhibit 2 in evidence now, Ms. Friedman?

MS. FRIEDMAN:  Not yet.  I have more foundation to lay, Your Honor.

THE COURT:  I don't know if it can be enlarged.



I can't really see what's on the screen.

MS. FRIEDMAN:  Oh, sure.  Is that better?

THE COURT:  Yes.  All right.  You may continue your questions, Ms. Friedman.

BY MS. FRIEDMAN:

Q    Ms. Kass-Gerji, how do you know you received these texts on or about March 11, 2024?

A    I had actually received these not long before I got the phone call from Don and Charlie.

Q    Okay.  And where were you when you received these messages?

A    In my home in D.C.

Q    Okay.  And who sent you these text messages?

A    As far as I know, Victoria.

Q    Okay.  And how do you know that?

A    It came from her personal number.

Q    And so why does it say Victoria at the top?

A    At the time, I had her phone number saved in my phone with her name.

Q    And who gave you that phone number?

A    She did.

Q    And prior to March 11, 2024, had you exchanged text messages with respondent using this phone number as it was saved in your contacts?

A    Yes.

Q    Are these screenshots a fair and accurate representation of the text you received from respondent on or about March 11, 2024?

A    Yes.

MS. FRIEDMAN:  Your Honor, I would now move to admit these texts as Petitioner's Exhibit 2.

THE COURT:  All right.  Exhibit 2 will be admitted over objection.

(Petitioner's Exhibit Number 2 was received into evidence.)

MS. FRIEDMAN:  Thank you, Your Honor.

BY MS. FRIEDMAN:

Q    Ms. Kass-Gerji, what, if anything, did you do in response to receiving these text messages?

A    I screenshotted it so I would have it in case, you know, the messages kept coming.  And then I deleted it immediately because I didn't want to keep looking at it.

Q    Okay.  Okay.  In your petition under incident C, you wrote that on March 12th, 2024, you received unwanted text messages from respondent, correct?

A    Correct.

Q    Are these those text messages?

A    Yes.

MS. FRIEDMAN:  Your Honor, I have what has been pre-marked as Petitioner's Exhibit 3 for identification

purposes.  I've previously submitted this exhibit to respondent via Box.com.

BY MS. FRIEDMAN:

Q    And who took these screenshots?

A    I did.

Q    For the record, when did you receive these messages?

A    March 12th at 5:07 p.m.

Q    Okay.  And where were you when you received these messages?

A    My home in D.C.

Q    And from what phone number did you receive these messages?

A    The respondent's personal cell phone number.

Q    For the record, can you please read it aloud?

A    ████-5814.

Q    And so why does this screenshot have the phone number, whereas the last screenshot said Victoria.

A    I deleted her name from the number so that I could show that it came directly from her, because I had already been accused of faking these text messages and been told I was lying.

Q    Okay.  And are these screenshots a fair and accurate representation of the text you received from respondent on March 12th, 2024?

A    Yes.

MS. FRIEDMAN:  Your Honor, I would move that these texts be admitted as Petitioner's Exhibit 3.

THE COURT:  All right.  Could you just -- is this just the one page?

MS. FRIEDMAN:  There are two.

THE COURT:  Okay.  All right.  Any objection to admission of Number 3?

MR. ABRAHAM:  No, Your Honor, I mean, the date is clearly referenced on the exhibit as well as the phone number.

THE COURT:  All right.  Number 3 will be admitted.

(Petitioner's Exhibit Number 3 was received into evidence.)

BY MS. FRIEDMAN:

Q    Ms. Kass-Gerji, scrolling to page 2, can you please read aloud the text starting with, "Just give up"?

A    "Just give up.  Do you need more incentive than being murdered?  How about I come to your home and burn it down, bitch?  I will set you and your house on fire. Pennsylvania doesn't want you.  No one wants you. Just"--do you want me to read it as a swear word or --

THE COURT:  I can read it.  It's admitted in evidence.  You can move on.



THE WITNESS:  "Just fuck off and die already".

THE COURT:  No, I meant you don't have to read it because I can read it.

THE WITNESS:  Oh, sorry.  Sorry, Your Honor.

THE COURT:  Go ahead, Ms. Friedman, you may ask your next question.

BY MS. FRIEDMAN:

Q    Ms. Kass-Gerji, did you take Ms. Vespico's threats to come to your home and burn it down and set you and your house on fire seriously?

A    Yes.  These were the first death threats I had been -- I had been sent or received.  And even now, it makes me nervous just looking at it.

Q    And is there any reason that you have personal knowledge of to believe that respondent would follow through on her threat?

A    I mean, I know her to follow through on her word and things that she says.  I have no reason not to believe her.

Q    Ms. Kass-Gerji, do you have personal knowledge of any prior aggressive incidents performed by respondent?

A    Nothing that I took at the time as a malicious intent towards me.  I do have knowledge of violence and threats towards others.

MR. ABRAHAM:  I'm going to object to that, Your

Honor.  I ask that that be stricken, unless she has some evidence of that.  And again we're talking about these threats, not some alleged threats against others.

THE COURT:  Ms. Friedman, is there any reason I should allow testimony about what she's heard about?

MS. FRIEDMAN:  Yes, Your Honor.  Oh, excuse me.

THE COURT:  What is your -- what is your response to the objection?

MS. FRIEDMAN:  Your Honor, we are not offering this testimony for the truth of the matter asserted, namely, that Ms. Vespico has been violent or threatened others, but for the effect that information had on the listener, believing that respondent had physically harmed someone in the past, contributed to her fear of respondent because she took respondent's threats of violence more seriously.

THE COURT:  I'm granting the objection.  You don't need to -- you can just move on, Ms. Friedman, you she can testify about how it made her feel, but I'm not going to allow evidence of anything else, threats to others.

BY MS. FRIEDMAN:

Q    Ms. Kass-Gerji, in your petition under incident D, you wrote that on March 23, 2024, you received unwanted text messages from respondent, correct?

A    Yes.

Q    Are these those text messages?

A    Yes.

MS. FRIEDMAN:  Your Honor, I have what has been pre-marked as Petitioner's Exhibit 4 for identification purposes.  I previously submitted this exhibit to respondent via Box.com.

BY MS. FRIEDMAN:

Q    Who took these screenshots?

A    I did.

Q    For the record, when did you receive these messages?

A    March 23rd at 9:51 a.m.

Q    And from what phone number did you receive these messages?

A    ██████-5814.

Q    And is that the same number as in the last set of texts?

A    Yes.

Q    So that's the number you understand to belong to Ms. Vespico?

A    Yes.

Q    And where were you when you received these messages?

A    I'm trying to think off the top of my head.


www.escribers.net | 800-257-0885

March 23rd, I believe I was in D.C.

Q    Okay.  Are these screenshots a fair and accurate representation of the text you received from respondent on March 23rd, 2024?

A    Yes.

MS. FRIEDMAN:  Your Honor, I ask that these texts be admitted as Petitioner's Exhibit 4.

THE COURT:  Any objection?

MR. ABRAHAM:  The only objection I would have, Your Honor, is based on the witnesses own testimony is she doesn't sound like she's sure that these text messages were received in in Washington, D.C.  She said she's not sure if she was in D.C.  So if she's not sure none of us can be sure.

THE COURT:  All right.

MR. ABRAHAM:  And if they didn't -- I'm sorry, Your Honor.  Go ahead.

THE COURT:  I don't think it matters whether they were received in D.C., particularly unless this would turn out to be the only incident that the Court considered.  Even if it did, there's jurisdiction because she lives in D.C.  And so even if there is incidents where she received these in Pennsylvania or some other place and they were sent from some place outside of D.C., I think the Court would have jurisdiction.  Jurisdiction rules are

pretty liberal in these cases.  So I will admit, Number 4 over objection.

(Petitioner's Exhibit Number 4 was received into evidence.)

THE COURT:  Counsel, is this a good time to break for lunch because I usually break from around 1:00 to 2:00?  But if it's not a good place to break, we can go a little bit longer.

MS. FRIEDMAN:  I just have a couple questions about this exhibit, and then --

THE COURT:  Okay.  Go ahead.

BY MS. FRIEDMAN:

Q    Ms. Kass-Gerji, can you please read the messages out loud starting at the beginning, stopping after the message in all caps?

A    "I swear, if you don't drop out of Miss Pennsylvania, I will come to your home and set it on fire. I don't even care if you or your mom are inside.  I actually hope you are.  You both deserve to die.  I am going to kill you, Robyn.  I don't understand why you don't get that.  I will burn you.  You will die".

Q    When respondent said, "I will burn you", did you believe her?

A    I didn't know if she had meant physically burn me at that time, or if she was trying to burn me

reputation wise.  Similar to like a burn book from Mean Girls.

Q    Is there one of those interpretations that you believed and one you didn't?  Or did you believe both?

A    I have no reason not to believe either, but I personally would have assumed she meant reputationally.  Except that she said she was going to kill me, so.

Q    Okay.  And did you consider dropping out of the Miss Pennsylvania competition as respondent requested?

A    Yes.

Q    Did you?

A    I spoke to my family, my team, my local directors, and we all decided that at this moment, dropping out would not be in my best interest because it would mean the bully wins.  And all the work I had put in would be for nothing.

MS. FRIEDMAN:  Okay.  That's all, Your Honor.  We can break for lunch.

THE COURT:  All right.  Why don't we break till 2 o'clock?  At 2 o'clock, I may call the other case briefly just to tell them that I'll probably just pick another date for them, because this will take up probably most of the afternoon.  So we should be able to get started, hopefully by 2:05 or so.  All right.  You all have a good lunch.  I'll see you all at 2:00.



MR. ABRAHAM:  Thank you, Your Honor.

MS. FRIEDMAN:  Thank you, Your Honor.

(Thereupon, a luncheon recess was taken from 1:04 p.m. until 2:14 p.m.)



A F T E R N O O N   S E S S I O N

THE DEPUTY CLERK:  Your Honor, recalling case number 2024 ASO 437, in the matter of Robyn Kass-Gerji versus Victoria Vespico.

(Pause.)

THE COURT:  It looks like the parties and counsel are present.  And so Ms. Friedman -- let me just double check.  All right.  I just want to make sure that--I know you didn't have any other witnesses on the line, and you probably don't either, Mr. Abraham.

(Pause.)

THE COURT:  So Ms. Friedman, you can continue with your questions for your client.

MS. FRIEDMAN:  Thank you, Your Honor.

**RESUMED DIRECT EXAMINATION**

BY MS. FRIEDMAN:

Q    Ms. Kass-Gerji, in your petition under incident E, you wrote that on that on April 1st you received unwanted text messages from respondent, correct?  I believe you're muted.

A    Yes.  Sorry about that.

Q

MS. FRIEDMAN:  No worries.

Court's indulgence while I share my screen.  Sorry, one moment.

(Pause.)

MS. FRIEDMAN:  Okay.  Before I was able to see you while I shared my screen.  And now I'm not, so I will just --

THE COURT:  Did you want us to try to pull up the exhibits here, Ms. Friedman, from the court order?

MS. FRIEDMAN:  Yes, please, Your Honor.  Yes, please, Your Honor.

THE COURT:  So Exhibit 5 is the one that you wanted?  Okay.

MS. FRIEDMAN:  Yes, please.

THE COURT:  Give us just a moment, and we should be able to pull it up on the screen.

MS. FRIEDMAN:  Thank you.

BY MS. FRIEDMAN:

Q    Ms. Kass-Gerji, are these the texts that you received from the respondent on April 1st?

A    Yes.

MS. FRIEDMAN:  Sorry.  And Your Honor, I have what is pre-marked as Petitioner's Exhibit 5 for identification purposes.  I previously submitted this exhibit to respondent via Box.com.

BY MS. FRIEDMAN:

Q    Who took the screenshots, Ms. Kass-Gerji?

A    I did.

Q    And for the record, when did you receive these messages?

A    April 1st at 12:57 p.m.

Q    And from what phone number did you receive these messages?

A    ██████-5814.

Q    And who do you know that phone number to belong to?

A    Ms. Vespico.

Q    Okay.  And the sender of these texts wrote, "I was second runner up last year, remember"?  To your knowledge, was respondent second runner up of a competition last year?

A    Yes.

Q    Do you know what competition?

A    The Miss Pennsylvania competition.

Q    And where were you when you received these text messages.

A    I was in D.C.

Q    Are these screenshots a fair and accurate representation of the text you received from respondent on April 1st, 2024?

A    Yes.

MS. FRIEDMAN:  Your Honor, I move that these texts be admitted as Petitioner's Exhibit 5.

THE COURT:  Any objection?

MR. ABRAHAM:  Well, again, Your Honor, I think my objection would be, and I would probably say this for all of them, I don't know how she knows my client actually sent these messages, even though -- maybe I'm not even certain that this is her telephone number.  I know the witness has testified that she believes it to be respondent's telephone number, but as to who sent these text messages, there's no evidence of that.

THE COURT:  All right.  I'll admit Exhibit 5.

(Petitioner's Exhibit Number 5 was received into evidence.)

THE COURT:  It's certainly correct that when a text message comes in, obviously no one knows for sure who actually typed the letters that appear in the text message.  It's not the same, for example -- but I'll allow it because of her testimony that she has communicated with the respondent using this phone number in the past.

And then obviously, petitioner may ask the Court to infer that it must have been the respondent who actually typed it since it's a phone that she has used.  And presumably she'll argue based upon the content as well.  But the objection is overruled.

So if that's going to be the objection to the -- you can just make that a standing objection, Mr. Abraham.

MR. ABRAHAM:  I'll do that, Judge.  Thank you.

THE COURT:  All right.

MS. FRIEDMAN:  Can the clerk please scroll to the second page?

BY MS. FRIEDMAN:

Q    And Ms. Kass-Gerji, can you please read aloud the text starting with, "I swear".

A    "I swear, if you leave D.C., I will ruin your life.  I will come to D.C. and set your house on fire.  And watch you" -- and what you "scream as your stupid dogs die.  It will be so funny.  Maybe I'll even take care of that awful boyfriend of yours.  It's not like either of you will be missed.  I can't wait to see the life leave your eyes as I crush your whole world.  You will kill yourself".

Q    And the next page, please.

A    "Or I will kill you.  Either works.  It's not like I will get caught.  I mean, look, you couldn't even get anyone to believe you.  You are too pathetic even for word.  I can't wait for you to just give up and die already".

MS. FRIEDMAN:  Thank you.  Sorry.  Court's brief indulgence.

BY MS. FRIEDMAN:

Q    What, if anything, did you do in response to

receiving these text messages?

A    I screenshotted it and then tried not to look at it and talked to my family about it.  We talked about making a police report, taking the legal route, but I was nervous about making a police report and going through an investigation because of the jobs I was applying to at the time.

Q    Can you explain that?

A    I was applying for jobs at the NSA and FBI, and was told if there was any active investigations that I was involved in, that my application would be dismissed.

Q    Okay.  And at this point, had you made -- what, if any, complaints had you made to authorities within the organization?

A    I had uploaded everything to a Dropbox and provided it to the PA State board and asked them to look into it.

Q    And to your knowledge, did they?

A    They told me without any legal help they could--there was nothing they could do.

Q    Okay.  All right.  In your petition under incident F, you wrote that on April 3rd, 2024, you received unwanted text messages from respondent, correct?

A    Yes.

MS. FRIEDMAN:  Madam Clerk, can you please pull



up Exhibit 6?

I apologize.  Court's brief indulgence.  Oh, I apologize.  Can we go back to Exhibit 5, please?  And the first page, please.  Sorry.  Gotcha.  Sorry I missed this when we saw them before.

BY MS. FRIEDMAN:

Q    So in the text, the sender wrote that quote, "Those scholarships are mine.  I'm going to use them at Harvard", end quote.  Ms. Kass-Gerji, do you have any reason to believe that respondent has plans to attend Harvard or is currently attending Harvard?

A    I believe later, she posted on social media that she was planning on attending Harvard.

Q    Okay.  Did you personally see that post?

A    At some point, her mom had shared it on Facebook.  I'm not sure as to when it was shared.

MS. FRIEDMAN:  Okay.  Madam Clerk, can you please pull up Exhibit 9?

Your Honor, I have what has been pre-marked as Petitioner's Exhibit Number 8 for identification purposes. I previously submitted this exhibit to respondent via Box.com.

THE COURT:  All right.  Hold on a second.  You asked for us to show Exhibit 9, I thought, and then you just said Exhibit 8.  Now, which one did you want?

MS. FRIEDMAN:  I apologize if I misspoke.  9 is correct.  What's up is correct.

THE COURT:  All right.  Go ahead.  You may continue, Ms. Friedman.

MS. FRIEDMAN:  Thank you.

BY MS. FRIEDMAN:

Q    Ms. Kass-Gerji, do you recognize what's on the screen right now?

A    Yes.  You showed it to me.

Q    Okay.  And what is it?

A    It's a TikTok video.

Q    Is this -- I'm sorry.  Go ahead.

A    Oh, I was going to say it's a TikTok video that states that she got into Harvard.

Q    And is this the post that respondent's mother shared on her Facebook, or is that something different?

A    No, it was this.

Q    Okay.  And for the record -- oh, sorry.  Is that respondent in the video?

A    Yes.

Q    And for the record, what is the username of the person who posted this video?

A    Victoria Vespico.

Q    Okay.  And for the record, when did it -- when does it appear this video was posted?

A    It looks like April 5th.  Sorry, it's a little blurry on my end.

Q    Is this a fair and accurate representation of the social media post you saw on respondent's mother's social media?

A    Yes.

MS. FRIEDMAN:  Permission to publish, Your Honor?

THE COURT:  All right.  Anything other than prior objections, Mr. Abraham?

MR. ABRAHAM:  Well, I would object as to relevance, Your Honor, in addition to my prior objections.

THE COURT:  All right.  Objection is overruled. Exhibit 9 will be admitted.

(Petitioner's Exhibit Number 9 was received into evidence.)

MS. FRIEDMAN:  Thank you, Your Honor.

THE COURT:  Did you want the video to be played?

MS. FRIEDMAN:  Yes, please.

THE COURT:  All right.

(Thereupon, the visual recording played for the Court was reported, but is not transcribed herein.)

MS. FRIEDMAN:  And just for the record, the video shows the respondent wearing a Harvard T-shirt and jumping excitedly.  And the caption to the video says the

respondent is quote "Finally Harvard official".

All right.  Now, if we could pull up Exhibit 6. Thank you.

BY MS. FRIEDMAN:

Q    And I apologize Ms. Kass-Gerji if you already said this, but are these the texts that you received from the respondent on April 3rd, 2024?

A    Yes.

Q    And who took these screenshots?

A    I did.

Q    And for the record, when did you receive these messages?

A    April 3rd at 2:27 p.m.

Q    And from what phone number?

A    ████ 5814.

Q    And that's the same as the past messages belonging to respondent?

A    Yes.

Q    Okay.  And where were you when you received these messages?

A    In D.C.?

Q    Are these screenshots a fair and accurate representation of the text you received from respondent on April 3rd, 2024?

A    Yes.



MS. FRIEDMAN:  Your Honor, I ask that these texts be admitted as Petitioner's Exhibit 6.

THE COURT:  All right.  Anything other than the standing objection, Mr. Abraham?

MR. ABRAHAM:  Nothing in addition to the standing objections, Your Honor.

THE COURT:  All right.  Exhibit 6 will be admitted.

(Petitioner's Exhibit Number 6 was received into evidence.)

MS. FRIEDMAN:  Thank you.

BY MS. FRIEDMAN:

Q    Ms. Kass-Gerji, can you please read the first page -- yes, the first page of messages?

A    "Hey, piggy bitch, are you ready to die now?  Just so you know no one is going to protect you.  No one believes you.  I don't care how many people think I'm a bully.  You all deserve to die.  I will do it myself if I have to.  You'd never know what was happening.  You fat, ugly piece of shit.  Have you lost any more weight yet?  Probably not.  You fuck! Go kill yourself".

MS. FRIEDMAN:  And can you please scroll to page 3?  Thank you.

BY MS. FRIEDMAN:

Q    And I know it's a lot, but Ms. Kass-Gerji, can

you please read these messages to the end?

A    "Speaking of, I'm going to strangle those dogs of yours.  Maybe kill that ugly boyfriend.  Maybe then once you've suffered, I'll finally kill you.  Let you out of your stupid misery.  Changing your phone number didn't help any, so neither will blocking mine.  I'm going to get a new phone and you'll never know who's texting you now.  Maybe it's me.  Maybe it's someone else who hates you.  God knows no one actually likes you".

Q    And the next page, please.

A    "Give up already.  Next time you're in Pennsylvania, I will burn your house down.  You won't even know everything in D.C. that you love is gone.  Maybe you'll go to jail for it instead of me killing you.  Do you think you'd be murdered in jail?  Probably.  I bet you would get gutted like a fish.  Ha, that's funny to think about.  You deserve that, you ugly, fat shit.  Why don't you ever respond?"

Q    And the next page, please.

A    "Do you think you're better than me because you aren't?  I'm prettier and smarter and nicer, and I do more community service.  Duh.  You could never be Miss America.  That crown is mine.  Debbie (phonetic) loves me.  Otherwise I would have been banned already.  They warned me.  But they won't do anything because they know I am the



real winner".

Q    And the next page, please.

A    "Miranda (phonetic) only won because she's bulimic and they felt bad.  Alyssa (phonetic) won because" she's a former -- "she was a former teen.  But me, I will be Pennsylvania's next Miss America.  You, you're just some girl who deserves to die.  No one wants you here. Even my mom hates you.  Don and Charlie hate you.  And they know I'm a saint".

Q    And the next page, please.

A    "Unlike you, who we all know faked her own rape, please, who would want to rape you?  You're so ugly.  I bet your boyfriend doesn't even want to have sex with you. Slit your own throat already".

Q    Thank you, Ms. Kass-Gerji.  Can you tell us how it felt to receive these text messages?

A    Even now, it's scary and upsetting.

Q    And when respondent wrote, "I'm going to strangle -- I'm going to strangle those dogs of yours", did you believe her?

A    Yes.

Q    Why?

A    I know her to be an animal and environmental advocate, so I'm not sure why she would threaten animals or my pets if I -- if she didn't want to follow through on

escribers
www.escribers.net | 800-257-0885

57

it.

Q    And when respondent wrote, "Maybe kill that ugly boyfriend", did you believe her?

A    Yeah.

Q    Why?

A    I have no reason not to believe her.

Q    Okay.  And when respondent wrote, "Maybe then once you've suffered, I'll finally kill you", did you believe her?

A    Yes.

Q    And why?

A    At this point, I had just gotten so many messages, I -- I -- like I said, I had no reason not to believe her.  I was just scared.

Q    And when respondent wrote, "Next time you're in Pennsylvania, I'll burn your house down", did you believe her?

A    Yes.

THE COURT:  Friedman, I'm going to ask you to move on.

MS. FRIEDMAN:  Okay.

BY MS. FRIEDMAN:

Q    The sender stated that blocking her number wouldn't help.  Did you ever try blocking respondent's number?



A    I did, and I had told a few people about it, but I had unblocked it to prove that the messages were still coming in when I was sharing them with the executive board.

Q    And when the respondent wrote, "I'm going to get a new phone, you'll never know who's texting you now", what did you understand that to mean?

A    I assumed that meant she was going to get a new phone number.  I had posted on social media that I was going to be changing my number in the future.  So anyone who needed my new personal number, once that happened to reach out to me now so that I can give it to them when the time comes.

Q    And after this message, did you receive threatening messages from any unknown phone numbers?

A    No.  Just this number.

Q    Any time after this?

A    Oh, yes.  I thought you meant directly after this.  Yes.  And later in May, I received messages from numbers I didn't recognize.

Q    Okay.  In your petition under incident G, you wrote that on April 4th, 2024, you received unwanted text messages from respondent, correct?

A    Yes.

MS. FRIEDMAN:  Madam Clerk, can you please pull



up Exhibit 7?

          BY MS. FRIEDMAN:

     Q    Ms. Kass-Gerji, are these those text messages?

     A    Yes.

     Q    And did you take these -- who took these screenshots?

     A    I did.

     Q    And for the record, when were these messages received?

     A    April 4th at 10:00 a.m.

     Q    And from what phone number?

     A    ███████ 5814.

     Q    And for the record, that is the same number we've seen before as respondents?

     A    Yes.

     Q    And where were you when you received these messages?

     A    I was in D.C. still.

     Q    Are these screenshots a fair and accurate representation of the text you received from respondent on April 4th, 2024?

     A    Yes.

     Q    Can you please read aloud the texts from the bottom of page 1, "No one is ever going to believe you", until the middle of the next page, and I'll just cut you

escribers
www.escribers.net | 800-257-0885

60

off when --

A    Okay.  "No one is ever going to believe you.  I get that ugly ad boyfriend of yours doesn't even believe you.  Have you shown him these" -- have you shown him these "messages?  Did you tell him that when I kill you that I'm going to kill him too?  And your stupid dogs.  If you come back to PA, I will come down to your house in D.C. and set your house on fire.  I will first stab your boyfriend and then set the house on fire so everyone thinks you did it".

Q    Thank you.  And then can you please scroll to page 3?  Ms. Kass-Gerji, can you please read from, "That crown is mine", and you can stop in the middle after, "Respond to me".

A    Oh, sorry.  I think it cut out for a second there.

Q    Can you please read from the top and then stop halfway down after, "Respond to me".

A    "That crown is mine.  I swear, if you even try to take it from me, I will make you bleed.  You're dead.  Do you hear me?  You are dead.  Get out of Pennsylvania, lard ass!  Respond to me, bitch!

MS. FRIEDMAN:  Thank you.  And Madam Clerk, can you please scroll back to the first page?

BY MS. FRIEDMAN:

Q    And we see here that respondent wrote, "So did you drop out yet.  Because if I see you at orientation I will actually punch you".  Did you go to orientation?

A    I did.

Q    When was that?

A    April 13th, 14th, 15th -- April 15th.  It was a Saturday.  I think the 15th was Saturday.

Q    Okay.  And was respondent there?

A    Yes.

Q    And you wrote in your petition that respondent threatened you at orientation, correct?

A    Yes.

Q    And this was on April 13th and labeled as --

A    April 13th, yes.

Q    And that was labeled under incident I?

A    Yes.

MS. FRIEDMAN:  And Madam Clerk, you can take down this exhibit.  Thank you.

THE COURT:  All right.  Were you asking to admit Exhibit 7?

MS. FRIEDMAN:  Oh, did I not?  Yes, please, Your Honor.

THE COURT:  All right.  Any additional objection, Mr. Abraham?

MR. ABRAHAM:  No, Your Honor.



THE COURT:  Number 7 will be admitted.

(Petitioner's Exhibit Number 7 was received into evidence.)

MS. FRIEDMAN:  Thank you.

BY MS. FRIEDMAN:

Q    Okay.  So Ms. Kass-Gerji, where were you when the respondent made these April 13th threats?

A    At orientation, the bathroom.

MS. FRIEDMAN:  Okay.  And I would just ask that the Court take judicial notice that April 13th was, in fact, a Saturday.

THE COURT:  All right.

MS. FRIEDMAN:  Your Honor?

THE COURT:  Yes, I will take judicial notice of that.

MS. FRIEDMAN:  Thank you.

BY MS. FRIEDMAN:

Q    Ms. Kass-Gerji, you had said that you were at orientation when she made these threats; is that what you said?

A    Oh, yes.

Q    Okay.  And where was orientation held?

A    The Yorktowne Hotel in York, Pennsylvania.

Q    Okay.  And this was orientation for the Miss Pennsylvania competition?

A    Yes.

Q    Okay.  And how did respondent communicate those threats to you?

A    It was a very quick passing in the bathroom of, I will get rid of you or I will off you, and then continued walking.

Q    Okay.  And so can you help us paint the picture? Where were you and where was Ms. Vespico when the comment was made?

A    I was walking into the bathroom.  I believe she was finishing up.  I didn't know she was in there.  I was -- the bathroom is very small.  There's only two sinks, so if you open the door, you could accidentally hit someone with a door that's in the one sink.  So it was just a quick.  She was going out, and I was coming in.

Q    Okay.  And did you have any idea that respondent was going to be inside the bathroom?

A    No.

Q    Had you considered the idea that she might be in there?

A    No.  I just really had to pee.

Q    Okay.  And you said that she said either I will get rid of you or I will off you.  Was anything else said?

A    No.

Q    Okay.  And did you know in advance that

respondent would be attending this orientation?

A    Yes.  It was mandatory for everyone.

Q    So why then, after receiving all these threats that we've already gone over, did you choose to attend orientation?

A    I didn't think there would be an opportunity where we would be alone at all.  I knew I would be surrounded the entire time by other young women, other, you know, adults.  I didn't even think about, you know, the possibility that we would have five seconds just the two of us.

Q    Okay.  And was there anything discussed at the orientation that you think is relevant to the matters?

A    They had -- they had known the situation going into orientation, and I was alerted that there would be an anti-bullying session about how we all need to work together and what we post online and send to other people needs to be better.

Q    And you said they already knew about it.  Who's they?

A    As in the executive team of the Miss Pennsylvania organization.

Q    And was that discussion held?

A    Yes, it was very brief.  Just them saying that we need to be more careful about what we say to each

other, that we need to work together and not to post anything online.  That was really all that was said.

Q    Okay.  And during this speech did you have the opportunity to observe respondent?

A    Yes.  She was laughing and rolling her eyes.

Q    Okay.  What, if anything, did you do to keep yourself safe from respondent while attending the orientation?

A    Except for that time I went to the bathroom, I was never alone.  I always had someone with me, whether it was an adult or another contestant.  There was always more than one person with me at a time.

Q    If the Court does not grant your request for the anti-stalking order, how, if at all, do you plan to protect yourself at the upcoming Miss Pennsylvania competition?

A    I won't be attending.  I will drop out for the safety of myself and my loved ones.  I just worry about the safety of my friends who will still be there.

Q    Okay.  And was anyone else around when the threats were made?

A    No.

Q    And how did those threats make you feel in that moment?

A    Nervous.  I kind of just stood there frozen for

a minute until I realized I had to pee again and ran into the stall.

Q    In your petition under incident H, you wrote that on April 9th, you received unwanted text messages from respondent, correct?

A    Yes.

MS. FRIEDMAN:  Madam Clerk, can you please pull up Petitioner's Exhibit 8?

BY MS. FRIEDMAN:

Q    Are these those texts?

A    Yes.

Q    And who took these screenshots?

A    I did.

Q    And for the record, when did you receive these messages?

A    April 9th at 4:48 p.m.

Q    And from whom did you receive these messages?

A    From ████-5814.  The number I believed to be the respondent's personal number.

Q    Are these screenshots a fair and accurate representation of the text you received from respondent on April 9th, 2024?

A    Yes.

MS. FRIEDMAN:  Your Honor, I move to admit these texts as Petitioner's Exhibit 8.

THE COURT: All right. Anything further, Mr. Abraham?

MR. ABRAHAM: No, Judge, just the standard previous objections.

THE COURT: All right. Exhibit 8 will be admitted over objection.

(Petitioner's Exhibit Number 8 was received into evidence.)

MS. FRIEDMAN: Thank you.

BY MS. FRIEDMAN:

Q Ms. Kass-Gerji, can you please read the messages beginning with, "Ugh, I have already", to the end of the first page?

A Yes. "Ugh, I have already -- I have already killed you if you weren't so pathetic. Did your mom die yet? I hear she has cancer again. I hope she suffers. Maybe I'll do it and put it out -- put it out of her misery. I want you to suffer."

MS. FRIEDMAN: And Madam Clerk, can you please scroll to the fifth page?

BY MS. FRIEDMAN:

Q And Ms. Kass-Gerji, can you please read the messages starting at the top of page five until the end of these messages?

A "Your yellow teeth are so disgusting. When they

start to rot, can I rip them out for you?  I bet it'll hurt, and you'll scream, ha, ha, ha.  Your scream has got to be better than your god-awful singing.  You should just kill yourself unless you want me to do it for you.  How should I do it?  Knife?  Hit you with a car?  What's slower and more painful?  I'll think about it if" -- and then a message cuts off.  "If you compete at Miss PA this year, I'll do it then.  You don't deserve to be there. Fuck off, fat loser."

Q    And how did you feel to receive these text messages?

A    Upset, scared, nervous.  It really, really made me contemplate whether or not I wanted to continue with the organization.  I actually had gone to the police just to ask, you know, what my options were after this.  And this is when, you know, we were finally able to get my number changed within the next 24 hours.

MR. ABRAHAM:  Your Honor, may I object just to get some clarification with that answer when the witness says she went to the police.  Can she clarify which police department she went to?  Which State?

THE WITNESS:  I went to the --

THE COURT:  Hold on a second--

THE WITNESS:  I went to the police.

THE COURT:  -- Ms. Kass-Gerji, the Judge has to

decide --

THE WITNESS:  Sorry.

THE COURT:  -- whether you have to answer the question or you don't.  You can move on, Ms. Friedman.  You can ask her if you want to Ms. Friedman or Mr. Abraham, you can ask her, obviously on cross.

BY MS. FRIEDMAN:

Q    Okay.  Okay.  In your petition under Incident J, you wrote that on April 14th, you received unwanted text messages from respondent, correct?

A    Yes.

Q    And so this was the day after respondent threatened to off you or something to that effect in the bathroom at the orientation?

A    Yes.

MS. FRIEDMAN:  Yes, can Madam Clerk please pull up Exhibit 10?

BY MS. FRIEDMAN:

Q    Are these those texts?

A    Yes.

Q    And who took these screenshots?

A    I did.

Q    And when did you receive these messages?

A    April 14th at 11:28 a.m.

Q    And who sent these messages?

A    It came from the number -5814, the number I knew to be the respondent's.

Q    And where were you when you received these messages?

A    I was in Pennsylvania.

Q    Okay.  And the messages on the left in gray, who sent those?

A    The respondent.

Q    And who sent the messages in blue?

A    I did.

Q    Okay.  Are these a fair -- are these screenshots a fair and accurate representation of the text you received from respondent on April 14th, 2024?

A    Yes.

MS. FRIEDMAN:  Your Honor, I ask that these texts be admitted as Petitioner's Exhibit 10.

THE COURT:  They'll be admitted unless there's any additional objection, Mr. Abraham.

MR. ABRAHAM:  No, Your Honor.

THE COURT:  All right.  They're admitted Exhibit 10 over objection.

(Petitioner's Exhibit Number 10 was received into evidence.)

BY MS. FRIEDMAN:

Q    Okay.  Ms. Kass-Gerji, in these messages, you

respond asking who the texts are from. Why did you do that?

A    I had gotten a new number, and I wanted -- I had recognized the number that came in, but I wanted to make sure that it was the same person who had been sending me the messages before I changed my number.

Q    And did you genuinely not know who was sending you the text messages?

A    I recognized the number. I had assumed they were from her, but I was hoping maybe, you know, I was wrong.

Q    Okay. And can you please read respondent's responses to, I'm sorry, who's this?

A    Yes. You know who this is, bitch. Did you think you could get rid of me that easily? I thought I told you not to come to orientation. I'm going to make your life a fucking living hell at States. You don't deserve to be there, you fat pig. Get out while you still can.

Q    And do you know what States are?

A    Yes, that is the state competition for Ms. Pennsylvania.

Q    And that's what's coming up in June?

A    Yes.

Q    And has anyone other than respondent told you --

excuse me, had anyone other than respondent told you prior to orientation to not go to orientation?

A    No.

Q    And how did it make you feel to continue receiving these texts even after you changed your number?

THE COURT:  Ms. Friedman, I'm going to ask you, in the interest of time, to not keep asking that question. Wait until the end of all the evidence if you want to ask her about the impact of getting all the texts.  We need to move things along.  It's getting too repetitive.

I'm not saying you can't introduce all your exhibits, but you don't need to ask each time how it made her feel.

MS. FRIEDMAN:  Yes, Your Honor.

BY MS. FRIEDMAN:

Q    The next day, April 15th, Ms. Kass-Gerji, you received unwanted text messages from respondent, correct?

A    Yes.

Q    And this is listed as Incident K in your petition?

A    Yes.

MS. FRIEDMAN:  Madam Clerk, please pull up Exhibit 11.

BY MS. FRIEDMAN:

Q    Are these those text messages?

A    Yes.

Q    And who took these screenshots?

A    I did.

Q    And when did you receive these messages?

A    April 15th at 11:27 a.m.

Q    From whom?

A    From -5814, the number I believe to be the respondent's.

Q    And again, are her texts in gray and yours in blue?

A    Yes.

Q    And where were you when you received these messages?

A    I was in Pennsylvania.

Q    Are these screenshots a fair and accurate representation of the text you received from respondent on April 15th --

A    Yes.

Q    -- 2024?

MS. FRIEDMAN:  And I ask that these be admitted as Petitioner's Exhibit 11.

THE COURT:  Exhibit 11 will be admitted.

(Petitioner's Exhibit Number 11 was received into evidence.)

BY MS. FRIEDMAN:

Q    And can you please read the first four messages there?

A    Yes.  "Listen here, you fucking bitch.  I will fucking kill you.  If you don't back out of Miss PA, I will come to your home and kill you.  Don't you get it?  I will kill you."

Q    And the message in blue that you said you sent, can you please read it aloud?

A    "Please stop, Victoria.  I really don't know what I've done to hurt you, but please stop."

Q    And why did you send that?

A    I was hoping maybe if I pleaded with her and just came right out and asked her to stop, that maybe she would.  It was worth a shot.

MS. FRIEDMAN:  And Madam Clerk, can we please just go to the second page?

BY MS. FRIEDMAN:

Q    And Ms. Kass-Gerji, can you please read respondent's responses to your text?

A    "Stop?  You want me to fucking stop?  Not going to happen until you kill yourself.  I will make your life a living hell until you finally pull the trigger and off yourself, bitch."

Q    And what, if any, steps did you take to protect yourself after receiving these messages?

A     We actually got an alarm system installed at my house in D.C. and an updated system at my mom's house.

Q     And you testified earlier that you had already spoken with the police --

A     Yes.

Q     -- to ask questions?

A     Yes.

Q     And was that the Pennsylvania police, the D.C. police, somebody else?

A     I had gone in person to the D.C. police just to ask for advice and what my options were.  And I had called the Pennsylvania police and asked them as well.

Q     And were those contacts to each police department around the time of April 15th?

A     Yes.

Q     Okay.  Okay.  And why hadn't you spoken with the police sooner?

A     I was nervous that if I went to the police and filed a police report, I would have to withdraw my applications for my future jobs at either the NSA or the FBI, which, ultimately, I did have to do to go forward with the anti-stalking order petition.  And I didn't know if there were options.  I didn't know the anti-stalking order or if even filing in D.C. was an option, even though I lived there.  I knew she lived in Pennsylvania and I was

also a part-time resident of Pennsylvania.  So I thought I could only go forward with this in Pennsylvania.  And Pennsylvania does not have an option like an anti-stalking order.

Q    In your petition under Incident L, you wrote that on April 25th, 2024, you received unwanted messages from respondents, correct?

A    Yes.

MS. FRIEDMAN:  If we could please have Exhibit 12.

BY MS. FRIEDMAN:

Q    Are these those texts?

A    Yes.

Q    And who took these screenshots?

A    I did.  Sorry.

Q    That's okay.  And when were these texts received?

A    April 25th at 5:33 p.m.

Q    And where were you when you received them?

A    In D.C.

Q    And from whom did you receive them?

A    From the phone number, I believe to be the respondent's.

Q    Are these screenshots a fair an accurate representation of the texts you received from respondent

on April 25th, 2024?

A    Yes.

Q    Can you please read the first page of texts?

A    "Hey pig, if you don't fucking leave Pennsylvania, I will come to your home and burn your house down.  I know where you live.  I will fucking kill you and your mother.  You will never be as good as me.  You don't deserve to be anything.  I got into Harvard, you know. You literally -- you're literally nothing.  I will burn you and your stupid mother.  You both deserve to die for being the bitches that you are.  No one likes you.  Just leave."

Q    And a few days after this, on May 1st, you received more unwanted texts.

A    Yes.

Q    Both those came from an unknown number; is that correct?

A    Yes.

THE COURT:  Wait.  Are you asking for Exhibit 12 to be admitted?

MS. FRIEDMAN:  Oh, did I not?  Yes, please. Your Honor.

THE COURT:  Exhibit 12 would be admit -- will be admitted.

(Petitioner's Exhibit Number 12



was received into evidence.)

MS. FRIEDMAN:  Thank you, Your Honor.  And now, if we could have Exhibit 13, please?  And for the record, we're now on Incident M, as in Mary.

BY MS. FRIEDMAN:

Q    Ms. Kass-Gerji, are these those texts?

A    Yes.

Q    And who took these screenshots?

A    I did.

Q    And when did you receive these messages?

A    May 1st at 7:54 p.m.

Q    And where were you when you received these messages?

A    In D.C.

Q    And do you recognize the phone number these texts came from?

A    I don't.

Q    Can you please read these messages?

THE COURT:  All right.  Well, are you asking to admit Exhibit 13 before she reads some of them?

MS. FRIEDMAN:  I believed the content was necessary in order to lay the proper foundation, but I'm happy to move for these to be admitted.

THE COURT:  All right.  I'll allow you to lay the foundation.  I'll hold off on whether I admit it.

MS. FRIEDMAN:  Thank you, Your Honor.

BY MS. FRIEDMAN:

Q     Go ahead, Ms. Kass-Gerji.

A     "Bitch, what the fuck do you think you're doing? Do you think contacting the police is going to save you? They called me, you know.  How they got my number, I'll never know.  You don't even have that.  I changed it. You'll never guess what it is.  You'll never be able to turn me on -- in.  You'll never be able to turn me in. Don't worry.  I told the police you were the problem."

Q     And then there are just a couple on the next page, I believe.

A     "You'll never win this.  What are you going to do now?  The cops can't help you.  This is all your fault. You should have just killed yourself.  Go die."

Q     And so you testified earlier that you reported -- you spoke with the police.  Did you ever make an official police report?

A     Yes.  I made a -- an official police report in Pennsylvania on May 1st, and I received these messages later that day.

MR. ABRAHAM:  Your Honor, I'm going to object as to that police report unless there's a copy of the report, which I don't believe has been offered here.  That report was actually made on that date.

THE COURT:  The objection is overruled.  The Court can accept her testimony that she made a police report.

MS. FRIEDMAN:  Thank you, Your Honor.

BY MS. FRIEDMAN:

Q   And Ms. Kass-Gerji --

MS. FRIEDMAN:  Oh, sorry.  Your Honor, I would ask that these texts be admitted as Petitioner's Exhibit 13.

THE COURT:  Anything further on Exhibit 13, Mr. Abraham?

MR. ABRAHAM:  No, Your Honor.

THE COURT:  All right.  Exhibit 13 will be admitted.

                    (Petitioner's Exhibit Number 13
                        was received into evidence.)

BY MS. FRIEDMAN:

Q   Ms. Kass-Gerji, have you ever made a police report on behalf of yourself against anyone other than respondent in 2024?

A   Nope.

MR. ABRAHAM:  Actually, Your Honor, I apologize.  Forgive me.  I know the Court has admitted 13 into evidence, but --

THE COURT:  Go, go ahead.  You can; if you have

an additional argument, I'll hear it.

MR. ABRAHAM:  Yes, Your Honor.  Unlike -- unlike the other -- some of the other text messages that have been introduced where the witness has said that she believes she recognizes the prior number to be that belonging to my client, she's testified this is an unknown number.  She does not know this number to be associated with my client.  It could've been anybody sending this.

I realize the content of these messages might make it appealing to suggest at least to the court that these are coming from my client, but until the Petitioner, through her attorney, can establish that this number is associated with my client, I'm going to object to their introduction based upon that.

THE COURT:  All right.  The objection is overruled.  I'll still admit number 13.  I mean, by admitting it into evidence doesn't mean the Court is making a finding that what's typed into Exhibit 13 was typed by the respondent.

The Court is just simply saying that the Court accepts that there's been a proper foundation laid, that this is something that appeared on the cell phone of the Petitioner.  And obviously, Petitioner is free to argue that the Court should conclude that it was sent by the respondent, just like if she had slid a typed -- someone

had slid a typed up note under someone's door, and you can argue from the content of it, you know, who you think might've sent the letter.  That doesn't mean the letter isn't admissible as something that's relevant to the case and properly authenticated.

You may proceed, Ms. Friedman.

MS. FRIEDMAN:  Thank you, Your Honor.

BY MS. FRIEDMAN:

Q    And Ms. Kass-Gerji, after reading these texts, who did you believe sent these messages?

A    I believe they were from the respondent.

Q    And you testified that you made an official -- that you spoke with both the D.C. police and the Pennsylvania police, but you only ended up making, or sorry, you made an official report with the Pennsylvania police.  Did you ever make an official report with the D.C. police?

A    No, I did not.  I instead applied for the ASO.

Q    Okay.  Is there any other reason that you didn't make an official report with the D.C. police?

A    At the time, I was overly worried about my mother.  She -- I made the report in her district with her district police because she is disabled.  I know the respondent has my mother's address.  We have sent mail and such with the return address on it.  And you know, she



can't protect herself.  Unlike me, who I at least have someone else living with me and three dogs, my mom can't even walk on her own.

Q     And any other reasons?

THE COURT:  Ms. Friedman, I'm going to ask you to move along, please.

MS. FRIEDMAN:  Fair enough.

THE COURT:  I'm going to need you to finish up your case in the next ten minutes, if possible.

MS. FRIEDMAN:  I have two more incidents. Hopefully, we can do that.

THE COURT:  All right.  Let's proceed.

BY MS. FRIEDMAN:

Q     In your petition, Ms. Kass-Gerji, under Incident N, you wrote that on May 8th, 2024, you received unwanted text messages from an unknown number, correct?

A     Yes.

MS. FRIEDMAN:  And these would be -- if we could pull up Exhibit 14, please.

BY MS. FRIEDMAN:

Q     Are these those texts?

A     Yes.

Q     And who took the screenshot?

A     I did.

Q     And how do you know that you received these

texts on or around May 8th, 2024?

A    This was the day I had gotten word that the respondent was trying -- they were trying to serve the respondent with papers on the ASO petition.

Q    Okay.  And what time did you receive these messages?

A    1:45 in the morning.

Q    And where were you when you received these messages?

A    In D.C.

Q    And you already testified that you don't -- that this is an unknown number.  Can you please read these messages?

A    "You're dead.  You're trying to serve me with what?  Back the fuck off, bitch.  I will literally fucking kill you."

Q    Who do you believe sent these text messages?

A    The respondent.

Q    And why do you believe that?

A    It's the only person I've ever served any type of papers to.

Q    Are these screenshots a fair and accurate representation of the text you received from respondent on May 8th, 2024?

A    Yes.

MS. FRIEDMAN:  Your Honor, I ask that these be admitted as Petitioner's Exhibit 14.

THE COURT:  Right.  Exhibit 14 will be admitted.

(Petitioner's Exhibit Number 14 was received into evidence.)

MS. FRIEDMAN:  And moving on to the final instant, we can pull up -- well, Your Honor, we ask -- you did take judicial notice of the return of service filed on May 23rd, 2024 and the facts therein.

THE COURT:  Yes, I can do that.

MS. FRIEDMAN:  Okay.  And if Madam Clerk you could please pull that up.  I have it as Exhibit 15 if that's quicker than from the docket.  And just for the record, this return of service states that the petition affidavit for the anti-stalking order, as well as the notice of hearing order to appear, were personally served on Victoria Vespico on May 10th at 7:40 a.m.

And then if we could pull up Exhibit 16, please.

BY MS. FRIEDMAN:

Q    Ms. Kass-Gerji, in your petition, you wrote that on May 10th, you received unwanted text messages from an unknown number.  Are these the -- is that correct?

A    Yes.

Q    Are these those texts?

A    Yes.

Q    And who took these screenshots?

A    I did.

Q    And when did you receive these messages?

A    May 10th at 8:03 a.m.  And then again at 10:04 a.m.

Q    And where were you when you received these messages?

A    In D.C.

Q    And can you please read the first set of messages?

A    Yes.  "You fucking bitch.  You filed for a restraining order.  What do you think that will do? Nothing.  You are dead."

Q    And have you ever filed any kind of restraining order against anyone other than respondent on behalf of yourself?

A    No.

Q    And who do you believe sent these messages?

A    The respondent.

Q    And are these screenshots a fair and accurate representation of the text you received from respondent on May 10, 2024?

A    Yes.

MS. FRIEDMAN:  Your Honor, I'd ask that these texts be admitted as Petitioner's Exhibit 16.

THE COURT:  Exhibit 16 will be admitted.

(Petitioner's Exhibit Number 16 was received into evidence.)

MS. FRIEDMAN:  Thank you.

BY MS. FRIEDMAN:

Q    And Ms. Kass-Gerji, can you please read the next set of text messages?

THE COURT:  No.  I'm going to have you move along.

MS. FRIEDMAN:  Okay.

THE COURT:  They've been admitted.  I can read the exhibits.

MS. FRIEDMAN:  Okay.  Thank you, Your Honor.

BY MS. FRIEDMAN:

Q    Have you received any unwanted text messages from unknown numbers since respondent was personally served with a temporary anti-stalking order on May 13, 2024?

A    No.

MS. FRIEDMAN:  Okay.

Court's brief indulgence.

BY MS. FRIEDMAN:

Q    And have you received any contacts from respondent since she was personally served with that temporary anti-stalking order?



A    No.

Q    Okay.  How has all of this impacted you?

A    It's put me on edge and caused my anxiety and depression to, you know, take a more forefront place in my brain.  You know, every time my phone buzzes, I'm kind of afraid to see who is messaging me because I -- especially if it's an unknown number.  I have turned down job opportunities and seminars and options to give speeches at non-profits and colleges and stuff in Pennsylvania, and I've barely left my house the past couple weeks.  It's just been overwhelming.

MS. FRIEDMAN:  Let the record reflect the petitioner's crying.

THE COURT:  Anything further, Ms. Friedman?

BY MS. FRIEDMAN:

Q    Just, Ms. Kass-Gerji, why are you asking the Court to grant you an anti-stalking order today?

A    So that I can continue being a part of the organization and working towards scholarships and competitions without fearing for my life and the life of others.  And even if that means not being a part of the Miss Pennsylvania organization, but protecting myself, my loved ones.  I will do anything to just feel safe again.

Q    Ms. Kass-Gerji, are you asking the respondent be ordered to not commit or threaten to commit any crimes



against you?

A    Yes, please.

Q    Are you asking respondent be ordered to stay at least 100 yards away from you, your home, your work, ▨ ▨ Clinton, Pennsylvania, and your pet dogs Igloo, Hat Trick, and Gordon?

A    Yes.

Q    And the ▨ address, what is that?

A    That is the house my mom and I share.

Q    In what state?

A    In Pennsylvania.

Q    Okay.  And are you asking the respondent be ordered to not contact you in any manner, either directly or indirectly, through a third party?

A    Yes.

Q    And are you also asking the respondent be ordered to stay at least 100 yards away from and not have any contact with your boyfriend, Zeth Merritt, and your mother, Deborah Kass-Gerji?

A    Yes.

Q    And why are you asking for that?

A    Because I'm scared for them as well as myself.

Q    And have they been threatened?

A    Yes.  In the text messages that were sent to me,

they were both threatened.

MS. FRIEDMAN:  Court's brief indulgence.  Okay. I have no further questions for Ms. Kass-Gerji at this time, but I would like to reserve the right to conduct, redirect, and recall my client on rebuttal.

THE COURT:  We're going to take a five-minute recess, so we'll come back at 3:15.  And then, Mr. Abraham, you can ask any questions you have for Ms. Kass-Gerji.

MR. ABRAHAM:  Thank you, Your Honor.

THE COURT:  Take a five-minute recess.

MS. FRIEDMAN:  Thank you.

(Recess from 3:10 p.m. until 3:16 p.m.)

THE DEPUTY CLERK:  This Court is again in session.  The Honorable Judge McCabe now presiding.

THE COURT:  All right.  It appears that both parties and counsel are present.  So we can resume.

Mr. Abraham, you may ask any questions you have. You might be muted, Mr. Abraham.

MR. ABRAHAM:  Thank you, Judge.

THE COURT:  Okay.

MR. ABRAHAM:  I didn't realize my mute button was on.

THE COURT:  We could hear you now.

**CROSS-EXAMINATION**

BY MR. ABRAHAM:

Q    Ms. Kass-Gerji, isn't it correct that you filed two prior petitions and affidavits for anti-stalking in this case; isn't that correct?

A    Yes.

Q    And who authored the first petition that was filed, the original petition?

A    I did.

Q    Okay.  And you filed an amended petition on or about May 8th; is that correct?

A    Yes.

Q    Okay.  And why did you -- why did you file an amended petition on May the 8th?

A    I had had a phone call with the judge to get the temporary anti-stalking order, and she said she needed more detail.  That originally, I had said that, you know, threats of death and violence was what I wrote, and she said that wasn't enough.  She just, you know, needed more information.

Q    Okay.  Okay.  And so that's why you filed the second petition?

A    Correct.

Q    All right.  And then, with respect to the third petition, the second, I'm referring to the second amended supplemental petition and affidavit for anti-stalking

order.  Was it you or your attorney that authored all of these allegations on the addendum Incidents A through it appears O.  Were they your words, or were they your attorney's words?

A    We worked on it together.  I went over all of the incidents with her, and she typed it up and sent it to me to read over and approve and make sure that, you know, that was -- everything was what I said and how I had portrayed it.

Q    Okay.  So your attorney, in effect, authored this, and then you approved it?

A    Yes.

Q    Okay.  All right.  So let me get to, I think, what's most important in this case.  And you had testified that you had believed, and if I'm wrong, correct me, but I believe you testified throughout this proceeding that you took these threats seriously and that you believe that Victoria, and I think I'm quoting, if not word for word, pretty close to your prior testimony, that she follows through on her words.  That was an accurate representation then of your testimony earlier, correct?

A    Yes.

Q    Okay.  So I guess that begs the question.  Well, let me ask you this first.  Did you share these text messages, the ones that have been admitted here today in



court, with your mother?

A    Some of them.  She hasn't seen all of them, but yes, some.

Q    Did you share the ones that the sender or the creator of these text messages, whoever it may have been, did you share the text messages, the specific text messages regarding the threats against your mother with your mother?

A    Yes.

Q    So she has seen all of the text messages in which your mother is ostensibly threatened by the sender or creator of these text messages, correct?

A    Yes.

MS. FRIEDMAN:  Objection, Your Honor. Relevance.

THE COURT:  Overruled.

MR. ABRAHAM:  I'm sorry, Your Honor.  I didn't hear what the Court said.

THE COURT:  Overruled.

MR. ABRAHAM:  Thank you, Your Honor.

BY MR. ABRAHAM:

Q    So with that in mind, your mother was aware of these threatening texts made against her that were sent to your phone, and did your mother contact her local police, and does she feel threatened by these text messages, your

mother, I mean?

A    She does, but she left the final decision up to me.

Q    Well, you would agree with me if it was your mother who feels threatened, that should be left up to her.

MS. FRIEDMAN:  Objection, Your Honor. Speculation.

THE COURT:  You can perhaps --

MS. FRIEDMAN:  Relevance.

THE COURT:  You can maybe just argue that or rephrase the question, Mr. Abraham.

MR. ABRAHAM:  Sure, Your Honor.

BY MR. ABRAHAM:

Q    If your mother chose, you would agree with me that if your mother felt threatened in any way, she has the capacity herself to go to the police and file some kind of report in the sense that she's feeling threatened. Would you agree with that?

A    Sure.

Q    And she chose not to do that in this case, correct?

A    Yes, she left it to me.

Q    Well, and that wasn't my question.  Your mother chose not to file a police report that she was threatened

through text messages sent to your phone, correct?

A    Correct.

Q    Okay.  And same goes for your boyfriend.  Did you share these text messages that were these threats that we've gone through here today where your boyfriend was threatened?  Did you share these text messages with your boyfriend?

A    Yes.

MS. FRIEDMAN:  Objection.  Relevance.

THE COURT:  Overruled.

BY MR. ABRAHAM:

Q    Yes, you shared them?

A    Yes.

Q    Okay.  Did your boyfriend feel threatened for his life or for his well-being or safety?

A    Yes.

Q    And did he go to the Metro D.C. police or any other law enforcement agency tasked with investigating such threats that are criminal, by the way, if investigated in that context?  Did he go to the police and report these text messages to the police?

A    He went with me when we went to the D.C. police to ask for advice.

Q    Did he file a report with the police saying, I feel threatened by these text messages to any police

agency that you're aware of?

A    No.

Q    Okay.  Now I'm going to ask you.  You have said you believe that Ms. Vespico is a person that's true to her words in your experience with her, correct?

A    Yes.

Q    And therefore, if you believe she was the person who made these vile and disgusting threats to you and your family and your animals, you believe then that she's capable of carrying such threats out, correct?

A    Yes.

Q    And yet, you chose to not file a police report with the D.C. police and giving them this evidence of what is clearly, potentially, a very serious set of crimes here, correct?

A    Yes.

Q    And I believe your reasoning for that, you mentioned this a couple times, was that you were more concerned about potential jobs or future employment opportunities that would potentially be unavailable if this turned into a criminal investigation, correct?

A    Not just a criminal, any type.  Like this included, because I wanted to go through with the anti-stalking order, I had to withdraw all applications.

Q    What kind of applications?  What are you talking

about?

A    Job applications that involved any type of investigation.

Q    Okay.  Well, this is not a criminal investigation; this case before the court today.  You're aware of that, right?

A    Yes.  I was told any type of lawsuit ongoing would -- would make them remove my application for the time being.

Q    Okay.  So are you telling the court here today, telling all of us here, that your job opportunities, which did not even come to fruition yet, these are just potential job opportunities, is more important to you than your own safety and your own life?

A    Not 100 percent.  This was a lot of back and forth between myself, my family, my lawyer and my potential employers.

Q    What do you mean a back and forth?  I mean, you're saying that you discussed whether or not you should file criminal charges with your attorney here today.

A    Yes, she asked me, and I -- my response was my goal is to feel safe not to ruin the respondent's life.

Q    Well, if your goal is really to feel safe, I think the only plausible reasonable thing with all due respect to you, Ms. Kass-Gerji, any person having received

these things and feeling these threats as credible should've gone to the police and --

THE COURT:  I don't hear a question, Mr. -- I mean, you're allowed to obviously lead the witness, but you're making more of a statement at this point.

MR. ABRAHAM:  Very well, Your Honor.  I'll rephrase.

BY MR. ABRAHAM:

Q   If you were seriously concerned for your life and welfare, which you've testified ostensibly that you are you've chosen not to make this a police investigation, correct?

A   For now.  Yes.

Q   Okay.  Why are you considering going to the police with this?

A   I have again gone back and forth about it in my own head.  Just like I said, I -- my goal was to find a way for me to be safe without ruining and putting a permanent dent on the respondents because --

Q   Well, what are -- what is the best way to feel safe according to what you've just said would be to let the police handle this based on what you've represented here today through your attorney as to the seriousness of this.  These are serious threats.  These are threats against your life, your boyfriend's life, your mother's



life, and the dog's lives.

Don't -- wouldn't you agree with me that the best way to deal with that if you're so concerned about your safety is to have the person that may have done this arrested and prosecuted as they should be?

A    Well, at the moment, she has not contacted me, or the person who has been sending these messages has not contacted me since the temporary order has been put forward.  So I was --

Q    That's not my question.

A    I'm trying to answer.

Q    My question is -- well, that's not the question I asked.

MS. FRIEDMAN:  Objection, Your Honor.  This is just argumentative.

THE COURT:  Sustained.

MS. FRIEDMAN:  She's explained why she didn't report --

THE COURT:  I think she answered your question, Mr. Abraham.

BY MR. ABRAHAM:

Q    You mentioned you -- or you haven't gone to the police up to now.  Are you considering going to the police with this because I believe you should?

A    I have gone to police.  That's how I asked for

escribers
www.escribers.net | 800-257-0885

advice on how I found out about the anti-stalking order.

Q   You didn't file a report.  You didn't say I believe I'm the victim of a crime here.  I want you, the police department, to investigate this.  Did you?

A   I did file a report.  It's in Pennsylvania.

Q   What about D.C.?  Most of these incidents you received in the District of Columbia.  They would have jurisdiction to investigate this case, and you met the Metro Police Department.  You've not gone to them and said I feel scared for my life, as does my boyfriend.  We're scared.  Please investigate and arrest this psychopath that's out there.  You've not done that.

A   They suggested I do this first.

Q   I didn't ask you what they suggested.  I'm just saying you didn't file a police report specifically --

MS. FRIEDMAN:  Objection, Your Honor, argumentative and asked and answered.

THE COURT:  I think you've asked it --

MR. ABRAHAM:  Very well, Judge.

THE COURT:  -- a number of ways.  So why don't you move on to something else?

MR. ABRAHAM:  Very -- very well, Judge.

BY MR. ABRAHAM:

Q   So let's talk about another area that we -- I think you touched on earlier in your testimony, and that

has to do with the phone call, I think, that occurred between yourself, Dawn Cinti, Charles Kasko, and my client Ms. Vespico. Do you recall that conversation?

A   Yes.

Q   Okay. And that occurred on or around March 11th of this year, right?

A   Yes.

Q   And would you agree with me that you in that call stated -- that conference call, if you will, stated to all of the participants in that call that you didn't believe Victoria sent these messages to you; isn't that correct?

A   That's incorrect. I stated I didn't know at the moment, but in the past I had known it was Victoria.

Q   In the past, you had known it's Victoria; is that what you said?

A   Yes.

Q   What area? What time period we talking about in the past? Is it something that's not been admitted into evidence here today?

A   It's as -- I have received text messages on and off bullying, which I stated earlier in my testimony that I had been received text app and numbers, and I was able to trace the IP address. This was ages ago from text -- text app numbers. So when I got the number, a different



number from what I assumed to be a text app, I stated --

Q    Okay.  Well --

A    -- it was also from her.

Q    All right.  But your earlier testimony, and I wrote it down word for word when your attorney asked you the questions regarding the March 11th conversation with those named individuals I stated a moment ago, you said, and I quote, felt like I was coerced into saying Victoria didn't do it.  But you just testified that you didn't say that.

A    I didn't say it.  I said that's how I felt.

Q    So did you -- did you actually say to those parties on that telephone call that you didn't believe Victoria did these or was behind these text messages?  Yes or no?

A    No.

Q    You didn't say that?

A    No.

Q    Your own testimony earlier was, I felt like I was coerced into saying Victoria didn't do it.  So did you --

MS. FRIEDMAN:  Your Honor, asked and answered.

THE COURT:  Overruled.  You can ask another question about it if you wish, Mr. Abraham.

BY MR. ABRAHAM:

Q    Are you disagreeing with me that your earlier testimony as to this subject area with this call?  Are you disagreeing with me that you said earlier that you felt like I was coerced into saying Victoria didn't do it?  Did you not say that before?

A    I did.  I did feel like I was being coerced but it doesn't mean I actually said she didn't do it.

Q    Well, I don't take it that way, but that's fine.  So we're going to be calling some other witnesses here to testify as to what you may have said actually that day.

THE COURT:  Why don't you just ask whatever questions you have her and you don't need to tell me or her what other witnesses are upcoming.

BY MR. ABRAHAM:

Q    And you also said that you believe these other individuals thought you were lying about this?

A    Um-hmm.

Q    And who are those individuals?

A    Dawn Cinti and Charles Kasko.

Q    Okay.  So you also talked about this orientation thing that happened in York, Pennsylvania.  I forget the date.  I think it was around April 13th of this year, and you had testified earlier about you running into my client in the bathroom, correct?

A    Uh-hmm.



Q    And I believe you also said that -- let me just read my notes here for a moment.

MR. ABRAHAM:  If I could just have a moment, Your Honor.

BY MR. ABRAHAM:

Q    I believe your testimony relative to that was, you know, you were comfortable going to this thing because you knew there were a lot of people around and everywhere you went, you were with someone else during that time, correct?

A    Yes.

Q    But yet at that particular moment in time you went -- you had people that you trusted or felt safe around everywhere you went there except when you went into the bathroom.  You went into the bathroom alone, correct?

A    Yes.

Q    And it just so happened that my client happened to be in the bathroom then.  Why did you choose to go in the bathroom alone if you were so concerned for your safety and you had people with you everywhere else you went?

A    Because the only thing I was thinking about at that moment was that I had to pee.

Q    And you couldn't bring someone with you at that point in time?

A     At that moment, I didn't think about it.  I just had to pee.

Q     So the idea of Victoria being a threat to you that concerned you at every other minute during that orientation was lost upon you at that moment in time?

A     Sure.

Q     You agree with that?

A     I mean, it was in the back of my head.  But like I said, the only thing going through my mind at the moment was I had to pee.  We had just sat through like an hour and a half of other people talking.

Q     Well, you just -- you also just said you didn't think about it.  So now it was in the back --

THE COURT:  Move -- move on, Mr. -- move on to something else, sir.

MR. ABRAHAM:  Well, let me go to Exhibit 8, Your Honor.

THE COURT:  Do you want us to pull that up on the screen?

MR. ABRAHAM:  Yes.

THE COURT:  All right.  We'll pull up Exhibit 8. If we could scroll down to, I don't know what subpage it is on Exhibit 8.  I guess it looks like maybe page 5, but it's where the Petitioner texts, I'm sorry, who is this? Right there.



www.escribers.net | 800-257-0885

BY MR. ABRAHAM:

Q   At that point, Ms. Kass-Gerji, your reply there, you weren't sure who this was at that point in time?

A   That's -- I think you're on the wrong exhibit. The -- technically, the I'm sorry, who is this is on the next day.

Q   Well, I didn't ask you yet what day it was.  I just asked you if --

THE COURT:  It's --

Q   -- at that moment in time, you were unsure as to who was texting you?

A   I had a feeling I had recognized the number, but I wanted to double-check.

Q   And that's why I asked the question because you weren't sure at that time.  Okay.

A   Correct.  I had just changed my number.

Q   Okay.  So the ███ 5814 number that had been bombarding you just the day before, or the days prior to this, you didn't recognize?

A   I said I recognized the number, but I wanted to double-check.

Q   Okay.  And that person never said who they were, right?

A   No.

Q   And you said previously that you did block what

you believed to be my client's telephone number at one time, right?

A   Yes.

Q   But then you unblocked it to see what messages you may have been missing?

A   I was told that if I wasn't still receiving messages, there was nothing they could do, so I unblocked it, and other messages started coming through.

Q   So are you agreeing with me here?  I'll ask you the question a little different way.  You had previously blocked what you thought to be my client's telephone number after you received these horrible messages, correct?

A   Yes.

Q   And you unblocked it for what purpose again?

A   I just went blank.  Sorry.

Q   I'll repeat the question.  So again, so I'm clear.  Why, then, did you unblock that number that you were receiving these text messages from?

A   To see if the messages were still coming in.

Q   Why would you care about that?  Why wouldn't you just leave your number blocked?

A   Because, at the time, I was trying to show that I was still getting messages, and it wasn't going to stop.

Q   Well, if you had kept your number blocked, you

wouldn't have gotten any more messages, would you?

A    I don't know that.  Could've come from a different number, like the others.

Q    That particular number?

A    Sure.

Q    Isn't that the whole purpose of blocking someone's number so they can't contact you?

A    Sure, yes.

Q    But yet you chose to unblock it?

A    Yes.

Q    Okay.  And you testified earlier, too, that your attorney asked you what steps you've taken to protect yourself because you feel so threatened and scared here, as a result of these horrible messages; I mean, I think we can all agree on that, that these are horrible, that your idea of protection was to install an alarm system both in your residence in the D.C. area as well as your mother's residence in Pennsylvania, correct?

A    Yes.

Q    So that, rather than go to the police with these very serious allegations, that was what you thought was the prudent thing to do rather than go to the police?

A    At the moment --

Q    In addition --

A    Yes.



MR. ABRAHAM:  Okay.  I have no further questions, Your Honor.

THE COURT:  All right.  Ms. Friedman, any additional questions for Ms. Kass-Gerji?

MS. FRIEDMAN:  Yes, very briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MS. FRIEDMAN:

Q    Ms. Kass-Gerji, on March 11th, when you spoke with -- when you had a telephone conversation with respondent Dawn and Charlie, had you received any death threats yet?

A    I don't believe so.  I had received a number -- I had received a text message from her personal number, I believe.  It was before I deleted her contact name, but I didn't bring it up to them because it felt like a useless argument at the time because they had told me -- they had actually stated to me on the phone that coming forward -- that I shouldn't have come forward.

Q    Okay.  And I believe you testified to this earlier.  The only text or screenshots that you showed Dawn and Charlie were the 3/10 -- the March 10th text admitted as Petitioner's Exhibit 1?

A    Correct.

Q    Okay.  And those are the ones from an unknown number?

A    Yes.

Q    Did you ever share with Dawn and Charlie that respondent had sent you messages from the number you knew to belong to respondent?

A    No.

Q    And did you ever share with Dawn and Charlie that you subsequently received death threats?

A    No.

MS. FRIEDMAN:  Okay.  No further questions, Your Honor.

THE COURT:  All right.  Any further evidence, Ms. Friedman?

MS. FRIEDMAN:  Not at this time, Your Honor, but reserve the right to rebuttal.

THE COURT:  All right.  Mr. Abraham, you can make -- if you want to make any opening statement, you can, or just call your first witness.

MR. ABRAHAM:  Yes, Your Honor.  I'll give a brief statement.  Thank you.

**OPENING**

MR. ABRAHAM:  Your Honor, the Petitioner has presented her case chief here before the Court today.  And obviously, I'm sure the Court's decision, in this case, will rely in some part to what degree only the Court can determine and judge that, obviously.  But these text

THE COURT:  You're probably getting into closing argument now.  Why don't we finish up your opening statement and then present the evidence?

MR. ABRAHAM:  Very well, Judge.

I'm just asking the Court to essentially, Your Honor, and I'm sure the Court will, keep an open mind as to this evidence and give it the appropriate weight or not that it may deserve.

And with that, Your Honor, I will call my first witness, who is the respondent, Victoria Vespico.

THE COURT:  All right.  Ms. Robinson will place you under oath, Ms. Vespico.

MS. VESPICO:  Yes, Your Honor.

THE DEPUTY CLERK:  Ma'am, please raise your right hand.

Thereupon,

**VICTORIA VESPICO,**

having been called as a witness for and on behalf of the Plaintiff, and having been first duly sworn by the Deputy Clerk, was examined and testified as follows:

**DIRECT EXAMINATION**

BY MR. ABRAHAM:

Q    Ms. Vespico, you've heard the testimony here today.  I'm going to ask you the obvious question.  Did you author, send, or cause to be sent any of these text

messages that have been introduced in evidence here today to the petitioner, Ms. Kass-Gerji?

A    No, I did not.

Q    The telephone numbers, some of which are not even listed on some of these exhibits, but are any that you saw the telephone -- some of the telephone numbers that were introduced as evidence here today, correct?

A    Yes, sir.

Q    Were any of those telephone numbers yours?

A    ⊠ 5814 previously was my phone number.

Q    I'm sorry.  Would you repeat that number?

A    Yes, ⊠ 5814.

Q    Okay.  Of all the telephone numbers that have been introduced here today, is it your testimony then that that's the only number that was ever at one time subscribed to you?

A    Yes, sir.

Q    And how long -- is that number still subscribed to you?

A    It is not.

Q    When did you cease having that number be subscribed to your name or account?

A    April 22nd.

Q    Of this year?

A    Yes, sir.

Q   And what was the reason, if any, that you stopped using that telephone number?

A   I had become aware of fabricated text messages utilizing that number, trying to pin these very heinous texts on me.  And it was at the suggestion of some loved ones that I go and change my phone number.  I became aware of them on April 21st, and first thing on April 22nd, I had my phone number changed.  I visited the facility at Verizon to go and have it changed.

Q   And how -- so when did you first become aware that there were at least some allegations of some kind of horrible text messages being sent to the petitioner here?

A   I became aware that my name had been associated with them in March.

Q   And how did you become aware of that?

A   A friend of mine who had competed at the Miss York County competition called me after the competition that Monday.  I apologize, Monday, I believe it was the 11th.  She had called me to inform me that somebody, she did not name who, had come up to her, presented her with a series of text messages, and asked me -- or asked my friend if she believed that they were me.  My friend said no, and then called me to inform me of the situation.  And I then called Dawn and Charlie to let them know what was going on.



Q    Okay.  And why did you do that?

A    At that point, my number had not been associated with them.  The name was the only thing that was being strung around, and I felt concerned for my safety and my validity in the organization, and I wanted to nip it in the bud immediately.

Q    Okay.  So let's talk about this; I think it was the March 11th conference call between, correct me if I'm wrong, Dawn Centini [sic], Charles Kasko, yourself, and Ms. Kass-Gerji, correct?

A    Yes, Dawn Cinti.

Q    Okay.  And what was the sum and substance of that conversation, if you recall?

A    Absolutely.  So we had gone back and forth all day about the situation, but around 7:00 p.m., maybe 8:00-ish, Charlie had called me to inform me that he and Dawn had spoken with Ms. Kass-Gerji and that she had agreed that we could have a conversation about the entire situation.

I agreed to be a part of the conversation as long as Dawn and Charlie were there to be witnesses.  I didn't want anything that I said to be misconstrued or be taken out of context, so I wanted to make sure that there were witnesses present.

When we got on the phone, we greeted each other.  Ms.

Kass-Gerji was given the opportunity to share her story. She said that --

THE COURT: Why don't you --

THE WITNESS: -- she had received --

THE COURT: -- wait, and I don't need narrative testimony. You can break it down with individual questions, Mr. Abraham, if you wish.

MR. ABRAHAM: Very well.

BY MR. ABRAHAM:

Q Did you have an opportunity to speak directly with Ms. Kass-Gerji in that phone call?

A Yes, I did.

Q What did you tell her?

A I told her that I was sorry that the situation was happening to her, but it wasn't coming from me, and that I wanted my name to not be involved with it.

Q What reply from her, if any, did she give to that?

A Robyn said that she, at no point, had accused me or brought my name into the situation. She said that other people had implied that it had been me and that she had, on prior knowledge, had the assumption that it had been me. She said that approximately a year prior, she had spoken to a friend who worked in Homeland Security, who was able to track the IP address for some of these

escribers
www.escribers.net | 800-257-0885

118

messages to my email address.

Q    Okay.  So what was the ultimate outcome, if there was such a thing, from that phone call?

A    Absolutely.  Me and Robyn both apologized to one another.  She stated very clearly that she did not believe, nor did she believe, that I was capable of sending these messages.  She ended the call by saying that she loved me, and that we were sisters, and that she could never think it was possible for me.  And we both agreed that we were excited to hopefully see one another at the Miss Gettysburg competition.

Q    Okay.  And you heard the earlier testimony from Ms. Kass-Gerji that you were both in -- at the York orientation back in April, right?

A    Yes, sir.

Q    And did you threaten her in the bathroom as she testified?

A    No, I did not.

Q    Did you even run into her in the bathroom?

A    No, I did not.

Q    Did you have any opportunity to even speak to her during this orientation whatsoever?

A    No, I did not.

Q    And how long did this orientation last?

A    Orientation was approximately from 9:00 a.m.



until 3:00 p.m.  We got there a little bit before 9:00 a.m., and we left a little bit after 3:00.

Q    And how many people were there in this orientation?

A    I would say close to 100, but if I had to give an exact number, it would probably be around 80.

Q    Okay.  And you were all in the same room?

A    Yes, sir.

Q    Okay.  So how has this -- how have these allegations affected you to this point?

A    It is been incredibly harmful and detrimental. I -- I am somebody who prides myself on integrity, and somebody who prides myself in the passion and work that I do.  And I have worked incredibly hard over the last 11 years in this organization to get as far as I have, and hopefully as far as I will get.

But this entire situation has really started to make me feel for -- fear for my safety and for the safety of my family.  I feel as though somebody is projecting horrific incidences and threats from me to somebody else.  And it makes me afraid for my safety, for my family.

And I haven't been able to sleep or eat, or I haven't really been able to process all of it, if I'm being completely honest.  It's just been such a whirlwind that it's unbelievable that somebody would do this, especially

escribers
www.escribers.net | 800-257-0885

for somebody to consider that it would be me.

A   And if you know the answer to this question, if the Court enters an order to not allow you to have any contact with the Petitioner that the order would ordinarily reflect, do you know whether or not you would be precluded from participating in the Miss Pennsylvania pageant?

A   I would not be allowed to compete in the Miss Pennsylvania competition.

Q   And you would have no cause whatsoever to send any of these horrific text messages whatsoever to the petitioner?

A   Absolutely not.

Q   Do you think someone is trying to stir up trouble between you two?

A   I do.

Q   Have you -- you've gotten along.  You guys were maybe friendly at some point; is that fair to say?

A   Yes, I had for many years considered Robyn to be a friend of mine.

Q   You've exchanged telephone numbers in the past?

A   Yes, sir.

Q   At what point, if any, did your friendship take a turn?

A   I would say in the summer of, I believe it was



2021, after Miss Pennsylvania, I had become aware -- my roommate at Miss Pennsylvania had informed me that Sunday after competition, that Ms. --

MS. FRIEDMAN:  Objection, Your Honor.  Hearsay.

THE COURT:  Do you have any sense of what, there would be any hearsay objection, Mr. Abraham?

MR. ABRAHAM:  No, Your Honor.  If it's hearsay and the Court wants to sustain the objection, I understand.

THE COURT:  Yes, I will sustain the objection as to what others told her in 2021.

BY MR. ABRAHAM:

Q    Victoria, just, if you could, very precisely and succinctly and shortly, quickly, what was the turning point, if there was one?

A    I had become aware that Ms. Kass-Gerji had claimed that I was saying rude and harassing things about her, and I informed Dawn and Charlie about the conversation that I had had.  And they advised me that the best thing to do would be to let it go because the stress of competition gets to people sometimes, and people say things that they don't mean, and they didn't know what the situation was, and it was just the best recommendation to let it go, and so that's what I did.

Q    Okay.  So prior to you learning that, you caught

wind that there was some allegation that you may have been sending her horrible text messages. Did you consider yourselves to be friends up until that point?

A     Absolutely. We had been Ms. Luzerne County and Ms. Wilkes-Barre/Scranton together, and it was something I was very proud of.

Q     And how long have you known one another exactly?

A     I think since 2019.

Q     Okay. Almost five years?

A     Yes, sir.

Q     And no problems prior to this?

A     Absolutely not.

MR. ABRAHAM:  I have no further questions, Your Honor.

THE COURT:  All right. Ms. Friedman, you may ask any questions you have.

**CROSS-EXAMINATION**

BY MS. FRIEDMAN:

Q     Ms. Vespico, you testified that at one point, the number ▨ 5814 belongs to you, correct?

A     Yes, ma'am.

Q     And that -- Thank you. And that you changed your number on April 22nd, 2024?

A     Yes, ma'am.

Q     Okay. And that it is after orientation?

A    Yes, ma'am.

Q    Okay.  And that was after most of the allegations in this case?

A    Yes, ma'am.

Q    Okay.  Okay.  And you plan to attend Harvard, or are currently attending Harvard?

A    I was accepted to a one-off course at Harvard. I post --

MR. ABRAHAM:  I'm going to object, Your Honor. It's beyond the scope of my direct.

THE COURT:  Overruled.

A    I had been accepted to an online Harvard Business School course, of which I posted about on March 5th and told all my friends about.

BY MS. FRIEDMAN:

Q    Sorry.  I'm just writing what you said.  And you were second runner-up in the 2023 Miss Pennsylvania competition?

A    Yes, ma'am.

Q    And you are currently competing for Miss Pennsylvania?

A    Yes, ma'am.

MR. ABRAHAM:  I'm going to object, Your Honor. I'm not sure how this is relevant right now.  I think a lot of this was established through --

THE COURT: Mr. Abraham, the objection is overruled. Your respondent testified she didn't make any of the text messages. The other side is entitled to ask questions about the content of some of the messages to -- in furtherance of their argument that these were made by Ms. Vespiccio [sic].

So the objection is overruled.

BY MS. FRIEDMAN:

Q    And so you had just testified that you're currently competing for Miss Pennsylvania, and that's part of the Miss America competition, correct?

A    Yes, ma'am.

Q    Okay. And you attended the orientation for the 2024 Miss Pennsylvania competition this year?

A    Yes, ma'am.

Q    And that orientation was in York, Pennsylvania?

A    Yes, ma'am.

Q    And at least part of that orientation took place on April 13th?

A    Yes, ma'am.

Q    And you saw Ms. Kass-Gerji at the orientation?

A    Yes.

Q    And you used the bathroom at some point during orientation?

A    Right before the candidate lottery around 2:00

escribers
www.escribers.net | 800-257-0885

p.m., 2:40-ish, yes.

Q    Okay.  And on or about May 1st, 2024, a Pennsylvania police officer contacted you, correct?

A    No, ma'am.

Q    Okay.  And you were served with the paperwork for this matter initially on May 10th, 2024, around 7:40 a.m.?

A    Yes, ma'am.

Q    But attempts to serve you had been made prior to March 10th, 2024?

A    I am not aware of that.

MS. FRIEDMAN:  Okay.  Court's brief indulgence.  No further questions, Your Honor.

THE COURT:  Any additional questions for Mr. Abraham?

MR. ABRAHAM:  No, Your Honor.

THE COURT:  All right.  Did you have another witness you wish to call, Mr. Abraham?

MR. ABRAHAM:  I do, Your Honor.  And that witness would be Dawn Cinti.  I'll bring her into my conference room if I could just have --

THE COURT:  All right.

MR. ABRAHAM:  -- a moment.  So I'm going to ask you -- we're going to pull this chair up over here.

MS. CINTI:  Okay.



CERTIFICATE OF TRANSCRIBER

I, Ivelisse Pagan, transcriber, do hereby certify that I have transcribed the proceedings had and the testimony adduced in the case of ROBYN KASS-GERJI v. VICTORIA VESPICO, Docket Number: 2024 ASO 000437, in said Court, on the 29th day of May, 2024.

I further certify that the foregoing 153 pages constitute the official transcript of said proceedings as transcribed from audio recording to the best of my ability.

In witness whereof, I have hereto subscribed my name, this 8th day of April, 2025.

*Ivelisse Pagan*

_____

TRANSCRIBER

