# EXHIBIT B

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
DOMESTIC VIOLENCE UNIT

```
- - - - - - - - - - - - - - - x
ROBYN KASS-GERJI,             : Docket Number:  2024 ASO 000437
                              :
        Petitioner,           :
                              :
                              :
        vs.                   :
                              :
                              :
VICTORIA VESPICO,             :
                              :
        Respondent.           : Wednesday, June 5, 2024
- - - - - - - - - - - - - - - x Washington, D.C.
```

The above-entitled action came on for an Anti-Stalking Order hearing before the HONORABLE JOHN MCCABE, Judge, in Courtroom Number 113.

APPEARANCES

(All present by video or telephone):

On Behalf of the Petitioner:

WILLIAM ABRAHAM, Esquire
Washington, D.C.


On Behalf of the Respondent:

HANNAH FRIEDMAN, Esquire
Washington, D.C.

25-01640


www.escribers.net | 800-257-0885

1

<u>T A B L E   O F   C O N T E N T S</u>

<u>WITNESSES</u>

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| On behalf of the Petitioner: | | | | |
| Bryce Cochran | | | | |
|   by Ms. Friedman | 18 | | | |
|   by Mr. Abraham | | 19 | | |
| Robyn Kass-Gerji | | | | |
|   by Mr. Abraham | | 29 | | |
| Abby Casey | | | | |
|   by Ms. Friedman | 47 | | 63 | |
|   by Mr. Abraham | | 57 | | 66 |
| On behalf of the Respondent: | | | | |
| Kelly Vespico | | | | |
|   by Mr. Abraham | 6 | | | |
|   by Ms. Friedman | | 12 | | |
| Victoria Vespico | | | | |
|   by Mr. Abraham | 68 | | | |

<u>M I S C E L L A N Y</u>

| CLOSING ARGUMENT BY PETITIONER | 71 |
|---|---|
| CLOSING ARGUMENT BY RESPONDENT | 88 |
| FINDINGS OF THE COURT | 103 |
| ANTI-STALKING ORDER | 112 |

THE COURT:  All right.  Ms. --

MR. ABRAHAM:  Ms. Vespico --

THE COURT:  Hold on.  Just place her back --

MR. ABRAHAM:  Sorry.

THE COURT:  -- under oath.

Thereupon,

**VICTORIA VESPICO,**

having been called as a witness for and on behalf of the Respondent, and having been first duly sworn by the Deputy Clerk, was examined and testified as follows:

THE COURT:  All right.  Go ahead, Mr. Abraham.

MR. ABRAHAM:  Thank you, Judge.

**DIRECT EXAMINATION**

BY MR. ABRAHAM:

Q   Ms. Vespico, you heard the testimony earlier today from Sgt. Cochran, correct?

A   Yes, sir.

Q   And you were also -- it's been intimated here by petitioner's counsel that you may have not been truthful in your earlier testimony that you didn't speak to the police; do you recall those questions last time?

A   Yes, sir.

Q   Okay.  If you testified in this proceeding on a previous date that you did not talk to the police, do you remember what the question was that was -- what the

question was that was asked of you by petitioner's counsel?  And if so, what was it?

A    Yes, sir.  Ms. Friedman asked me if I had been contacted by the Findlay Police Department on May 1st.

Q    And were you?

A    No.

MS. FRIEDMAN:  Objection.

THE COURT:  What's the basis of your objection?

MS. FRIEDMAN:  The transcript can speak for itself.  I don't believe Ms. Vespico's memory of the -- of the transcript is the best way to handle this.

THE COURT:  Move on with your --

MS. FRIEDMAN:  It's a misstatement of the record.

THE COURT:  -- the objection is overruled.  You can ask your next question if you have any others, Mr. Abraham.

MR. ABRAHAM:  Very well, Judge.

BY MR. ABRAHAM:

Q    So Ms. Vespico, you did actually speak to -- was it Ofc. Cochran on another date?

A    Yes, sir.  I spoke with Sgt. Cochran on May 2nd.

Q    Okay.  Are you certain it was May 2nd?

A    Yes, sir.

Q    Okay.  And why are you certain of that?

A    On May 1st, I was in Camp Hill, Pennsylvania, for an all-staff meeting for Girl Scouts in the Heart of Pennsylvania, where I work.  So I was out of town all day. I did not become aware that the Kingston Township Police had visited my house until May 2nd, when my brother informed me.

Q    Okay.  And was it you that reached out to Sgt. Cochran on May 2nd?

A    Yes, sir.  As soon as my brother gave me the document with the phone number to contact, my mother and I went inside and called them.  I believe it was around 5:00 p.m.

Q    Okay.

MR. ABRAHAM:  I have no further questions, Your Honor.

THE COURT:  Anything further, Ms. Friedman?

MS. FRIEDMAN:  One moment, Your Honor.  No. Thank you, Your Honor.

THE COURT:  All right.  I believe we've concluded the evidence in the case.  So we can proceed with your closing remarks.

Ms. Friedman, did you need a break, or did you want to -- I mean, I'm happy to let you all take five minutes if either side wants it.

MS. FRIEDMAN:  Yes, please, Your Honor.



many of these cases, it is rare that parties, you know, conduct themselves -- unfortunately, it's a little bit more rare than we'd like -- respectfully and so forth.

And obviously, in this case that, in the Court's view, both Ms. Kass-Gerji and Ms. Vespico were always respectful in the way they answered questions and you know, interacted, even though these are difficult things for anyone to go through, whether they're a petitioner or respondent in a case.  I think counsel both, you know, sort of set forth really what the issues are before the Court.

### FINDINGS OF THE COURT

THE COURT:  I wanted to start by making sure to say that the standard in this case, it is obviously the burden of the petitioner.  You know, I think both sides made very good arguments in support of their positions. But obviously just to make sure that you know, obviously, I'm placing the burden on the petitioner, as it should be, and that the burden is by a preponderance of the evidence, which is a lesser standard than what is called clear and convincing evidence or beyond a reasonable doubt, which is the highest standard that is used in criminal cases.

I think another thing that both sides probably agree on is that if these texts, you know, were sent, but whoever sent them was stalking Ms. Kass-Gerji -- and I



think Mr. Abraham, you know, was candid in saying, you know, if these were sent by a person, obviously that person is engaging in stalking and criminal threats as well.  And that's correct under the law.  Certainly, this is, you know, not a case where a court is sure about what happened, but not sure if it is enough to make stalking. I mean, certainly the incidents -- the evidence that was presented would clearly make out a case of stalking.

22-3132 and -- I'm sorry, 22-3132 and 22-3133 are the operative statutes that talk about stalking.  And I won't spend much time on this because I don't think it's that much in dispute that the conduct that's alleged here would make out stalking.  22-3132 talks about engaging in a course of conduct.

And there's different kinds of things.  I mean, a lot of us -- you know, when you think of stalking, you think of some examples where someone's following someone around or monitoring where they are, placing them under surveillance.  There's other examples:  unlawfully entering a person's property.  But the operative part of this case would be the threats that were communicated through text messages.  So that's, again, 2231-32, subsection (a).

And then this course of conduct has to be directed at a specific individual.  And obviously, that



individual in this case is Ms. Kass-Gerji.  But there's sort of three levels of intent, that a person either intends for the target of their stalking to fear for her safety or the safety of another person, or to feel seriously alarmed, disturbed, or frightened, or suffer emotional distress.  So those three results are what the person either intends to cause or knows that their conduct would cause that person to have that fear or alarm or disturbance or emotional distress.  Or the third option is that the person who's accused should have known that a reasonable person would feel afraid for her safety, or seriously alarmed, disturbed, or frightened, or suffer emotional distress.

So again, I think it's not a question of whether the conduct meets the legal description of stalking.  It's whether Ms. Kass-Gerji has proved by a preponderance of the evidence that the threatening messages were in fact sent by Ms. Vespico.

And I think that each side, you know, gave substantial argument in terms of why the Court should or should not conclude that Ms. Vespico sent the texts.  And I'll just go over -- I may not list everything that counsel referred to or even everything that entered into my consideration, but the ones that are significant.  Obviously, this is a case -- I mean, there's some things



you sort of take for granted because you've done a long trial. But obviously, Ms. Vespico and Ms. Kass-Gerji know each other. It's not disputed that, you know, they've known each other for a few years because they've each participated in, you know, beauty pageants or contests. They've had occasions where they have spoken to each other on the telephone or exchanged text messages.

Some of the exhibits that were sent, or that were presented as evidence, Exhibits 2 through 8, 10, 11, and 12 all came from a telephone number, ▨▨▨-5814, that Ms. Kass-Gerji indicated she had received that number from Ms. Vespico. And Ms. Vespico did acknowledge that that at some point had been her telephone number, although I believe her testimony is that she changed her number at about April 22nd of this year. And then there were -- the Exhibits 13, 14, and 16 were from different telephone numbers.

The Court does find that Ms. Kass-Gerji has proved by a preponderance of the evidence that these texts were sent by Ms. Vespico. So that's specifically Exhibits 1 through 8, 10 through 14, and 16.

And you know, as I said, part of it is, you know, just the evidence that these parties clearly have exchanged phone numbers. And obviously, I'll get to the part of -- you know, that's certainly important for the



Court to consider whether someone else is doing this to, you know, frame Ms. Vespico, including Ms. Kass-Gerji.

But I start with, you know, the more obvious evidence that, yes, there certainly were text messages -- or I'm sorry, screenshots of text messages that were presented by Ms. Kass-Gerji. And again, they clearly make out stalking, the numerous threats to kill either Ms. Kass-Gerji or her mom, or her animals, or a male friend of hers.

And so I start with the fact that these are from a number that clearly is a phone number that Ms. Vespico has used. But also the content of the messages gives details about the beauty pageants and so forth that, you know, obviously both Ms. Vespico and Ms. Kass-Gerji would know about.

But a lot of the details seem to be ones that not anyone else would necessarily know about, such as the details about the police being called. And I think Ms. Friedman pointed this out. Exhibit 13 is a May 1st text that refers to calling the police. And that was sent on the evening of May 1st. And the evidence was that on May 1st during the day is when the sergeant was contacted.

And then some other police officers -- and I don't think this was disputed -- had gone to speak to Ms. Vespico; hadn't reached her in person, but had left word

at her house on May 1st, and then she called them back on May 2nd. But there's the message on May 1st at 7:54. Do you think contacting the police is going to save you? They called me. You know.

And then on May 8th, Exhibit 14. This is at a time after there had been an attempt at service. And the message is, you're trying to serve me with what? And then on May 10th, Exhibit 16 is at 8:03 a.m., which is about 20 minutes after Ms. Casey served the papers. There's a text message saying, you filed for a restraining order.

And also then, I think Ms. Friedman also pointed out that the evidence in the case is that as of May 10th, there had not been service of a temporary anti-stalking order because it -- and I don't know if either attorney referred to this, but I know it because there's an order from May 10th. So sometime later on May 10th is when a judge signed an anti-stalking order, and that was served on Ms. Vespico on May 13th, as Ms. Casey testified. And no threatening texts. There was no evidence of any threatening text after that, which again, would seem consistent with Ms. Vespico knowing that she's on notice now that she's facing possible criminal charges for violating a temporary anti-stalking order.

And so I think Mr. Abraham has raised very important points. And obviously, the Court has considered



those throughout the trial.  And just a few things I would suggest, that I thought of, is there's a lot of things that, you know, people -- you know, people can testify falsely.  There's lots of ways that a person can testify as to how they identify someone, like recognizing a voice in a phone call, or recognizing a voice, like in person, but it's dark, and you didn't see the person.  There's lots of ways that evidence can come in that isn't obviously failsafe.  I mean, people can testify falsely in court all the time.

But in the Court's view, in this case, the only person who really could've sort of framed Ms. Vespico would've been Ms. Kass-Gerji herself.  I mean, just the amount of detail of things like the service, you know, unless -- it's just hard to imagine who else possibly could've had this type of information to make this up as a way to sort of frame Ms. Vespico.  But you know, there isn't any evidence of that, that Ms. Kass-Gerji in some way manufactured evidence or made this up.

And I also, you know, think Mr. Abraham raised an important thing for the Court to consider in terms of, you know, what actions did Ms. Kass-Gerji take.  And I think it can cut different ways.  You know, I think essentially, he's arguing perhaps that if Ms. Kass-Gerji really felt this was, you know, more serious, she would've



tried to get the police to pursue criminal charges. And you know, I think he's correct that many people in that situation would have pushed it more for not just an anti-stalking order but for a criminal investigation, and that the fact that she didn't do so -- that perhaps the Court should conclude that, you know, it's because she knew that she would somehow be found out for manufacturing this evidence if there was a more thorough investigation.

But I think, you know, a just as reasonable explanation is that lots of people don't, you know, pursue things as much as they certainly can. I mean, sadly, it's something the Court sees every day in this court, is folks -- and that's not this case, obviously, but cases where there's been a lot of physical violence by one person towards another, and they just, like, hardly ever go to the police or don't seek any restraining orders. And it's certainly something any factfinder should consider, is, you know, why didn't you go to the police if this was really -- if you really thought this woman was the one threatening you?

But you know, I have considered in the other -- another side of it, I guess, is that, you know, if Ms. Kass-Gerji was really out to get Ms. Vespico, presumably she would have pushed this more with the police, you know, as opposed to just an anti-stalking order, which, of



course, you know, I'm sure can have consequences for anyone, but certainly someone like Ms. Vespico, who wants to participate in, you know, beauty contests and pageants. And you know, I don't know what exactly will happen. But I certainly believe that it's possible it'll interfere with her ability to do that.

But for all of the reasons that I have indicated, I do find that Ms. Vespico is the one who sent the text messages that were Exhibits 1 through 8, 10 through 14, and 16; and also that she made the in-person threat on April 13th. And I guess the main reason for that is I just, you know, obviously I believe her, that she received these messages and didn't manufacture them. And you know, I don't believe Ms. Vespico when she says that she didn't send these texts. And so I also think it would be more obvious that she'd be the one not to testify truthfully about the April 13th threat.

And you know, her mom's testimony, obviously, is something for the Court to consider. But I'm also not sure I would think that folks who are together for hours on end would've been able to keep track of every single time somebody went to the to the bathroom and who they were with. So I am not suggesting in any way that Ms. Vespico's mom was purposely trying to be untruthful, but I just don't think it's realistic to think she would've



necessarily seen this brief encounter between Ms. Vespico and Ms. Kass-Gerji going in and out of a bathroom.

And so for all of those reasons, I will grant the request for an anti-stalking order.  Give me just a moment to see if there's anything else I wanted to say to you all from my notes and things that you talked about.

All right.  And again, I think just to follow up on the important points that both Mr. Abraham and Ms. Friedman made about, you know, this could be manufactured -- and you know, I don't know enough about the details of how that could be done, but I'm not sure that it's important that I know that.  I do believe that a person could manufacture evidence.  I mean, obviously, Ms. Kass-Gerji could've just created these documents, you know, on a piece of paper to mimic screenshots.  I mean, you know, I just want you to know that I've considered that those things are possible.  But I don't find any evidence to support that.

And I do think appropriate foundation was laid for, you know, the process of, you press a button on your phone, and it takes a photograph of something that has shown up on your phone in text messages.  The way it appears on, you know, the iPhones that most of us have is it has a phone number at the top and then whatever the other person typed into it.



And so yes, the Court is making a leap that Ms. Vespico is the one who typed those messages into a cell phone and pressed send, you know, to get them to go to Ms. Kass-Gerji. But I just thought it was important to sort of lay out that those are the logical inferences the Court has to make in order to find that she has stalked. And I do make those logical inferences based upon the screenshots of the photograph -- the screenshots of the text messages from Ms. Kass-Gerji's phone, as well as all the content of what was in the text, is what leads me to conclude that Ms. Vespico is the person who, sadly, typed those horribly threatening comments to Ms. Kass-Gerji.

So the order will be in effect, and I'll email it to each of you later this afternoon. It'll be in effect for two years. So it starts today. It'll expire on June 4th of 2026 and will say that Ms. Vespico shall not commit or threaten to commit any criminal offenses against Ms. Kass-Gerji or her animals or family members. And it will say that -- give me just a moment -- she shall stay at least 100 yards away from Ms. Kass-Gerji in her home or workplace and vehicle, and from her animals, and from her mother, and from Zeth Merritt.

And then I'll want to check back with you all on any modifications to the stay-away when they're around one another, and also that Ms. Vespico shall not contact Ms.



Kass-Gerji in any manner, so in other words, not by phone or text message, not by email or social media, not in writing, and not in any manner, either directly or indirectly, through a third party; and shall not possess, control, harm, or threaten to harm or dispose of Ms. Kass-Gerji's animals.

The order, as I said, will be in effect for two years. And Ms. Vespico should obviously comply with the order, and I have confidence that she will. But a person who violates an anti-stalking order can be charged with a criminal offense called violation of an anti-stalking order. And that decision wouldn't be made by any individual person, like Ms. Kass-Gerji. A prosecutor's office would have to decide that. But if a person is found guilty of violating an anti-stalking order, the maximum penalty is 180 days in jail and a fine of $1,000.

And Mr. Abraham can talk to Ms. Vespico about firearms. But in general, it's considered a violation of D.C. law to possess firearms once an anti-stalking order has been entered. And also, it may be a violation of federal law. I don't ask people, and I'm not asking any questions. It's not necessary for me to know whether she does have any firearms or was planning to obtain firearms, but just that she should talk to counsel about whether that would cause her to be in violation of any state or

escribers
www.escribers.net | 800-257-0885

federal laws.

Let me just -- with regard to the stay-away, I'll ask each counsel what they think. I don't know whether Ms. Vespico or Ms. Kass-Gerji may be, you know, in the same -- and obviously, they don't live together -- but if they're in the same place for, you know, beauty pageants or something like that. I would think that I would want to have a shorter distance, and I was going to suggest something like 20 feet. In other words, while they're in the same place, you know, just because they're both going about their business of participating in a contest, that Ms. Vespico will stay at least 20 feet from Ms. Kass-Gerji.

Ms. Friedman, what is your suggestion? Is that agreeable to you?

MS. FRIEDMAN: We would oppose that, Your Honor, for two reasons. First is just the security level, the severity of these threats. Victoria Vespico has threatened to kill my client. You can kill someone from 20 feet away, unfortunately. And also, just the emotional toll of Ms. Kass-Gerji having to be in the same general vicinity as Ms. Vespico after what has been found by the Court.

And then the second is logistics. From what Ms. Kass-Gerji has explained to me, there is no way to keep



these women separate during the competition.  There are apparently, like, group dance numbers, you know.  So they both need to be on the same stage.  There's only two dressing rooms.  And the two of them, due to the order they've been set in, would be in the same dressing room, and they'd be on the same floor in the hotel.  You know, it just didn't seem logistically possible to keep them separate --

THE COURT:  So would you just be saying --

MS. FRIEDMAN:  -- or could guarantee her safety.

THE COURT:  -- that she keep the 100 yards, but no exceptions?

MS. FRIEDMAN:  Correct.  We would ask for no exceptions.  And we think any exception would really minimize the severity of the crime.

THE COURT:  All right.  I mean -- and again, I don't know, and it's not really my business, whether the two of them are going to be, you know, participating in any future pageants, I guess.

But Mr. Abraham, did you have any view on that? You're muted, Mr. Abraham.

MR. ABRAHAM:  Did it again, Judge.  I'm sorry.

THE COURT:  That's all right.

MR. ABRAHAM:  Judge I appreciate the Court considering at least some modification of a typical order



to allow these two ladies to perhaps compete in something that, I think no one would dispute, means very much to both of them, and yet still achieve the objective that the Court, I think, is trying to achieve, in that there is an order in place.  And that order, even if it were modified to allow each of them participation at the Miss Pennsylvania pageant that's beginning in a matter of a few days, Your Honor -- I think it's starting this Sunday, if I'm not mistaken.

You know, I respectfully disagree with opposing counsel here that that end can't be served with a less restrictive covenant, if you will, or order that would not preclude my client from participating in the pageant, yet she would still have to stay a minimum of 20 feet away from Ms. Kass-Gerji.  I think that's very reasonable.  And I would -- I thank the Court for even considering it.  And I would certainly not be opposed to that.

So you know, listen, I'm sure there's security at this pageant.  If the Court is inclined to modify the order in such a way, I will personally make sure that the Court's order is presented to the proper authorities that run this pageant and explain to them that they need to take precautions to have these individuals not get closer than 20 feet away from one another, if that's what the Court is inclined to do, as well as to make sure maybe



that if there's an overnight stay, they don't stay on the same floor.

And you know, listen, is there always that -- always that opportunity or potential that they could inadvertently bump into one another less than 20 feet? Yeah, I suppose it's theoretically possible.  But I think if certain precautions are taken into consideration -- and my client's certainly going to be made aware of them as she's hearing it real time -- that she makes a Herculean effort to abide by the Court's order and not come anywhere near Ms. Kass-Gerji, certainly not within 20 feet, under any circumstances, Your Honor.

I think that would be a fair resolution, Your Honor.  I understand it's a difficult decision here for the Court in weighing this evidence.  And I appreciate everything the Court has said in coming to its verdict.

But it would be a shame, and another crime, in a sense, figuratively speaking, if my client were, as a result of this -- not only has to deal with the stigma of having an anti-stalking order on her, but then can't participate in something that means so much to her as well as Ms. Kass-Gerji.

THE COURT:  Yeah.  I mean, both counsel, just in this limited issue, thought of things that I don't think had automatically occurred to me.  And I appreciate what



you're saying.  I am going to make an exception, even though I absolutely hear what Ms. Friedman is saying, and it obviously has some merit.  You know, the reasoning -- I just think it's the best way to resolve this issue where both the parties do try to be in the same location because of something they're each pursuing.

But I hear Ms. Friedman's concern, and I think they're valid ones.  You know, the sort of morbid way to view that is, obviously, folks can violate the orders anyway or can also -- you know, even if -- even if there wasn't any exception.  And I also appreciate the practical challenges that she's suggested as well, which I imagine, you know, are not small ones.

But the other -- the thing Mr. Abraham mentioned that is a concern in all of these cases -- and you know, I'll say this for the benefit of both parties -- is that, yes, even if people have the best of intentions, sometimes they might inadvertently be less than 20 feet away from one another.  And you know, for Ms. Vespico, the idea is just to, you know, go in the opposite direction and just make sure not to interact in some way with Ms. Kass-Gerji.

The other thing I considered is that, you know, while obviously the evidence of serious threats was there, there hasn't -- at least in this case, there hasn't been any evidence of actual physical violence.  And so that's

escribers
www.escribers.net | 800-257-0885

another reason why I'm willing to take the chance of having the exception. Because I, you know -- while I do think it's important that Ms. Vespico not, you know, communicate with Ms. Kass-Gerji anymore, I don't have any view whatsoever about, you know, whether she should or shouldn't participate in pageants.

So the way I worded it -- while you were talking, I also was thinking of the way to word it. And I think the best way to word it is that if respondent is participating in a pageant and petitioner is also present, that's when Ms. Vespico must stay at least 20 feet away. And that way, in other words, if there was some pageant that Ms. Kass-Gerji was only entered in but not Ms. Vespico, she needs to either not go to it or stay 100 yards away. In other words, if Ms. Vespico wants to be there because she's participating, I don't want my order to prevent that from happening. And that's whether Ms. Kass-Gerji wants to be there to participate, or as a participant, if she's there, and Ms. Vespico is participating, that's when the 20 feet will be the limit, as opposed to 100 yards.

So one of the things we wanted to make sure -- and you can provide this, Mr. Abraham -- Ms. Robinson told me we don't yet have an email address for Ms. Vespico -- because what I'll do is email the order to everybody. And



you can just either put that in the chat or you can send it to the Court.

But let me also just double-check. Was there anything else, Ms. Friedman, that you think the Court forgot to mention in terms of what you're requesting as relief in the order?

MS. FRIEDMAN: No, but Your Honor, I would ask you to reconsider the exception specifically because this is Ms. Kass-Gerji's last year of eligibility. So it won't be a concern going forward. However, Ms. Vespico, due to her age, is still eligible to compete next year. And as Ms. Kass-Gerji testified, if Ms. Vespico is allowed to be at this competition, she's going to drop out of the pageant for her own safety. She would not feel comfortable being in the same -- even 20 feet away from Ms. Vespico, and so would really be punishing Ms. Kass-Gerji, even though Ms. Vespico is the one found responsible for stalking and making horrific threats.

THE COURT: All right. I'm sticking with the decision that I've made. You know, obviously, any time a court issues a civil protection or anti-stalking order, there's the possibility that it'll be violated. And you know, it's up to Ms. Kass-Gerji. She can participate in whatever contests she wants to participate in. I'm not going to issue an order that I believe prevents Ms.



Vespico at this point from participating.

So you don't have any other questions about the order, though, correct?

MS. FRIEDMAN:  Let me just check my list.

MR. ABRAHAM:  Your Honor, while she's checking additional questions, may I have the Court's email address once again, please, so I can send my client's email address to the Court?

THE COURT:  Sure.  You can send it to judgemccabechambers.  It's just J-U-D-G-E-M-C-C-A-B-E-C-H-A-M-B-E-R-S@dscs.gov.

MR. ABRAHAM:  Dcsc.gov.  Yes, Your Honor.  Thank you.

THE COURT:  District of Columbia Superior Court. All right.

Anything further on the order, Mr. Abraham?

MR. ABRAHAM:  No, Your Honor, I think the Court was quite clear in the exception.  And I thank the Court for its consideration in that regard.

THE COURT:  All right.  Anything further on the order, Ms. Friedman?

MS. FRIEDMAN:  Does the Court need the spellings of the other protected parties or the address of Mr. Kass-Gerji's mother?

THE COURT:  I can put an address in, although a



lot of times you just say stay away from the persons. Staying away from Ms. Kass-Gerji's mother is what's in there.  And also, there was a person named Zeth, Z-E-T-H M-E-R-R-I-T [sic].  Did you want to put the name of Ms. Kass-Gerji's mother?  Or you were saying you wanted to put an address?

MS. FRIEDMAN:  Yes, please.  And Ms. Kass-Gerji, correct me if I'm wrong.  I have the spelling for Zeth's last name, M-E-R-I-T-T.  One R, two T's?

MS. KASS-GERJI:  Two R's, two T's.

MS. FRIEDMAN:  Okay.  That's my mistake then, Your Honor.  And then Ms. Kass-Gerji's mother's name is Debra, D-E-B-R-A, same last name.

THE COURT:  Okay.  Did you want to just leave it to stay away from her?  Or did you also want to put an address for her to stay away from?

MS. FRIEDMAN:  Yes.  ████████████████ ████████████████ in Clinton, C-L-I-N-T-O-N, Pennsylvania.

THE COURT:  All right.

And let me just check.  Ms. Vespico, I just want to make sure.  I mean, obviously, you know, you can talk to your attorney.  I know this is not the decision you were hoping for, and you're entitled to talk to him about appealing it, if you'd like.  But I just want to also make sure that you didn't have any questions, because if you

escribers
www.escribers.net | 800-257-0885

did, I'll try to answer them about what the order requires.  Do you have any questions about it?

MS. VESPICO:  Not at this time, Your Honor.  But I do appreciate your exception.

THE COURT:  All right.  So it'll take us probably just a few minutes to get this typed up, and then it'll get emailed out to everybody later this afternoon.

All right.  Again, thank you, Counsel, for an excellent job on the case.  And thank you, Ms. Vespico and Ms. Kass-Gerji, for you know, conducting yourselves in a respectful way in what I'm sure was not an easy thing to go through.

All right.

MR. ABRAHAM:  Thank you, Your Honor.

THE COURT:  You all take care.

UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

MS. FRIEDMAN:  Thank you, Your Honor.

THE COURT:  Parties are excused.

(Thereupon, the proceedings were concluded.)

                    *  *  *  *

escribers
www.escribers.net | 800-257-0885

CERTIFICATE OF TRANSCRIBER

I, Becky Kleiner, transcriber, do hereby certify that I have transcribed the proceedings had and the testimony adduced in the case of ROBYN KASS-GERJI v. VICTORIA VESPICO, Docket Number: 2024 ASO 000437, in said Court, on the 5th day of June, 2024.

I further certify that the foregoing 124 pages constitute the official transcript of said proceedings as transcribed from audio recording to the best of my ability.

In witness whereof, I have hereto subscribed my name, this 5th day of April, 2025.

_____

TRANSCRIBER

